[Crim. No. 9056. In Bank. Mar. 30, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. LEO CARLTON LOOKADOO, JR., Defendant and Appellant.

Richard M. Grossberg, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Edsel W. Haws, John L. Giordano and Daniel J. Kremer, Deputy Attorneys General, for Plaintiff and Respondent.

McCOMB, J.—This is an automatic appeal (Pen. Code, § 1239, subd. (b)) from a judgment, after trial before the court without a jury, finding defendant guilty of murder in the first degree and imposing the death penalty.

*Facts*: Early in the morning on Sunday, October 25, 1964, defendant took his .22 caliber rifle, left his apartment, and drove to a service station in Modesto operated by John Arthur Inman. He bought a dollar's worth of gasoline and a quart of oil. He then asked for a package of cigarettes, and when Inman went back into the living area of the station to get the cigarettes, defendant picked up his rifle, followed Inman inside, and said, ''This is a stick-up, I want to get some money.'' Turning around, Inman replied, ''Nobody is going to get me,'' and moved toward defendant, reaching for the rifle.

Defendant started firing at Inman. He fired six shells in all, and when Inman continued to advance toward him, defendant hit him with the rifle and knocked him to the floor unconscious. He poured a pan of gasoline over Inman's outstretched body, took the money from the cash register, struck a match to the gasoline-soaked body, and fled.

On February 11, 1965, defendant entered a plea of not guilty and not guilty by reason of insanity to the murder charge and thereafter waived the 60-day time limitation. (Pen. Code, § 1382, subd. 2.) On April 14, 1965, he appeared in court with counsel and made motions for leave to waive a jury trial and to withdraw his plea of not guilty by reason of insanity. Both motions were granted.

On April 19, 1965, defendant, represented by counsel, was tried before the court without a jury and found guilty of

murder in the first degree. The court fixed the penalty at death.

Defendant contends:

First. *That in view of his mental condition he should not have been permitted to waive a jury trial.*

Two court-appointed psychiatrists examined defendant prior to the hearing at which he waived a jury trial. One classified him "in the borderline mental defective groups," and the other estimated him to be "of dull normal intelligence." Defendant contends that he should therefore not have been permitted to waive a jury.

In *People* v. *Monk,* 56 Cal.2d 288, 298 [10] [14 Cal.Rptr. 633, 363 P.2d 865], we rejected the defendant's claim that because of his lack of education and his mental state, as evidenced by psychiatrists' reports, he was unable to understand the consequences of waiving a jury trial. The reports showed that he was emotionally disordered but sane, that his native intelligence was adequate, and that he had been in school to perhaps the tenth grade.

In the present case both psychiatrists concluded that defendant was sane. One of them reported that on direct examination defendant was found to be in contact with his environment, that he could think quickly and easily, that there was no blocking of thought, and that on the Bellvue Verbal test he scored highest in comprehension, arithmetical reasoning, and retention. The other reported that his responses were coherent and relevant and without evidence of any disorder in his thought processes. Defendant started school at five or six years of age and quit at sixteen in the ninth grade. Accordingly, our holding in the *Monk* case is controlling here.

Although the trial court in a criminal case is not required to explain to a defendant the nature and consequences of his action in waiving a jury trial where he is, as in the case at bar, represented by counsel and fails to show that either he or his counsel has been misled as to the result which might occur from his waiving a jury trial (*People* v. *Golston,* 58 Cal.2d 535, 538-539 [3] [25 Cal.Rptr. 83, 375 P.2d 51]; *People* v. *Langdon,* 52 Cal.2d 425, 432 [2] [341 P.2d 303]), the record shows that the trial court nevertheless went to great lengths to explain the nature and consequences of such a waiver. In addition, defendant's attorney in several instances paraphrased the court's statement to present the matter in even simpler language.

 The judge asked defendant numerous times if he understood the explanations given to him, and defendant repeatedly replied that he did and also acknowledged that his attorney had fully explained them to him before the hearing at which he waived a jury trial.

The excerpt from the reporter's transcript quoted in the footnote[1] shows that the matter was presented in such clear and concise language that even one "in the borderline mental defective groups" or one "of dull normal intelligence" must be presumed to have understood what his rights were

---

[1]During the hearing on defendant's motion to waive a jury trial, the following occurred [Brackets together in this manner [ ] indicate deletions]:

THE COURT: Mr. Lookadoo, you heard your counsel's remarks in regard to the indicated request, which has been made in this matter [motions to waive a jury and withdraw defendant's plea of not guilty by reason of insanity]. Have you not?

THE DEFENDANT: Yes, sir.

THE COURT: And do you join in that request?

THE DEFENDANT: Yes, sir.

THE COURT: [] I want you to understand [] that you do have a constitutional right to have your question of guilt and the other issues that are raised by your pleas, determined by a jury. You understand that, do you?

MR. STONE [Public defender, representing defendant]: I don't think he understands what you are saying. May I paraphrase the Court?

THE COURT: Please do.

MR. STONE: What the Judge says, you have a legal right to have your case tried by a jury. [] What the Judge is asking is if it is your desire to have your case tried by the Judge, sitting up there without a jury?

THE DEFENDANT: Yes, Your Honor.

THE COURT: That is your wish, Mr. Lookadoo?

THE DEFENDANT: Yes, Your Honor.

THE COURT: What I was asking a moment ago, was that you understand you have a right, you have a right to have it decided by 12 jurors. Do you see what I am saying? You could have had 12 jurors sit in the jury box [] and make a determination of your guilt or innocence. []

THE DEFENDANT: Yes. []

THE COURT: [] I am just trying to get it clear that you understand what your rights were. I realize your request. I understand it. I want you to know what I am trying to get across to you. Do you understand what your rights were?

THE DEFENDANT: Yes.

THE COURT: I guess any man can waive his right to a jury trial, but I wanted you to understand what they were before you waive it.

MR. STONE: May I again paraphrase?

THE COURT: Yes.

MR. STONE: When the Judge says "waive," he means you are saying you don't want this case tried by a jury. If you say "I want a jury," of course, you will get a jury, or you can say, "I waive," which is a legal way of saying, "I know I can have it, but I don't want it."

THE COURT: Do you understand now?

THE DEFENDANT: Yes, sir.

THE COURT: What I am asking now—what you are saying is you are not desirous of having a jury to hear the various issues, but you want a trial judge to hear it, is that your pleasure?

when he gave as clear an indication of comprehension as defendant did.

Under the circumstances, the trial court properly accepted defendant's waiver.

Second. *That the trial court's finding of premeditated murder was erroneous in view of the evidence of defendant's mental condition.*

---

THE DEFENDANT: Yes.

THE COURT: Is that what you want to do?

THE DEFENDANT: Yes.

THE COURT: You understand by so doing, the issue of your guilt or innocence under the charge which has been made against you by the indictment will be heard by a trial judge. One judge is going to hear and decide the question. Do you understand that?

THE DEFENDANT: Yes. []

THE COURT: [] is it your plan to waive the jury with respect to the penalty phase of this trial?

THE DEFENDANT: Yes, Your Honor.

MR. WOLFE [District Attorney]: I might say, if the defendant waives a jury on the guilt phase, under 190.1, he cannot be tried by a jury on the penalty phase.

THE COURT: Fine, but I don't want any doubt in Mr. Lookadoo's mind, or his counsel's mind. You understand when you waive a jury on the guilt phase [] that [] likewise you are waiving a jury trial in connection with [] the penalty that might be imposed if you are found guilty. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: [] You understand by waiving the jury, you say you are going to have the case tried by a judge. The trial judge hearing the case is also going to decide what penalty might be imposed in this case in the event you are found guilty.

Do you understand that?

MR. STONE: May I ask him?

THE COURT: Yes, you may.

MR. STONE: Do you understand the trial judge is going to decide the question of penalty in your case if you are found guilty? Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: All right. Let me ask you this: Lastly, do you understand by the nature of the charge which is presently made against you, that the indictment charged you with first degree murder in this case? You understand that the penalties involved in this particular offense, what they are? Do you understand what the penalties are?

THE DEFENDANT: Yes, death or life.

THE COURT: [] Are you aware of the fact [] that the Court could, if the Court found you guilty, [] sentence you to death. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Do you also understand as an alternate, the Court could impose life imprisonment. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: The reason I am asking you [] these questions is that I want you to understand what this all means with respect to your saying, ''I am willing to try it with a trial judge. I am satisfied.'' I take it, Mr. Stone you have gone over this in some detail with Mr. Lookadoo.

This contention is likewise without merit. The first degree murder conviction is warranted on the theory that the homicide was committed during the perpetration of a robbery. The evidence leaves no doubt that defendant robbed the victim and killed him in the perpetration of the robbery.

■ Under the felony-murder rule of section 189 of the Penal Code, a killing committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary, mayhem, or any act punishable under section 288 is murder of the first degree. This is true whether the killing is wilful, deliberate, and premeditated or merely accidental and whether or not the killing is planned as a part of the commission of the robbery. (*People* v. *Cheary*, 48 Cal.2d 301, 313 [13] [309 P.2d 431]; *People* v. *Morlock*, 46 Cal.2d 141, 146 [6] [292 P.2d 897].)

---

MR. STONE: Very thoroughly.

THE COURT: You have talked with your counsel?

THE DEFENDANT: Yes.

THE COURT: Has he explained all of this to you? Do you feel he has?

THE DEFENDANT: Yes.

THE COURT: Do you feel you understand?

THE DEFENDANT: Yes, sir.

THE COURT: All right. Now, lastly, let me ask you this: Has anybody [] made any promises of any kind to you at all? Has any menace, or any pressures or coercions or offers or anything else been made to you to induce you [] to waive the jury trial, that has caused you to say, ''I am going to try this case with a judge''? [] Has anybody made you any promises that if you try the case before a judge rather than a jury, you are going to get some special treatment?

THE DEFENDANT: No, sir.

THE COURT: Or said there was going to be some special result forthcoming in this case. Has anybody done that?

THE DEFENDANT: No, sir.

THE COURT: Do you clearly understand? I am not here to prejudge it. I know nothing about the facts of the case, but I want you to understand this court could be terribly concerned if anybody made any representations to you at all that by not asking for the jury trial the judge is going to try the case, ''Therefore I am not going to get death — or I am going to get a life imprisonment, or'' — or has — do you understand that?

MR. STONE: I don't know.

THE COURT: All you — you may paraphrase it.

MR. STONE: What the judge is asking, has anybody, investigator, or anybody made any promises that if you try the case before the judge without a jury that there will be some specific promised result on either guilt or innocence or penalty?

THE DEFENDANT: No, no, sir.

THE COURT: All right. I take it then that you are, as far as you know, as you sit here now, freely and voluntarily waiving your right to a jury trial, both as to the issue of guilt and the question of sanity and penalty. Is that correct?

THE DEFENDANT: Yes, sir.

MR. WOLFE: I have no objection, Your Honor. []

THE COURT: Do you know any fact, as either of you sit here now, you feel ought to be disclosed to the Court respecting the waiver of the jury

Even independent of the felony-murder rule, however, the first degree murder conviction finds adequate support in the theory that defendant committed a deliberate and premeditated killing.

As stated in *People* v. *Cartier,* 54 Cal.2d 300, 305-306 [2] [5 Cal.Rptr. 573, 353 P.2d 53]: "The necessary elements of deliberation and premeditation may be inferred from proof of such facts and circumstances as will furnish a reasonable foundation for such an inference, and where the evidence is not in law insufficient, the matter is exclusively within the province of the trier of fact to determine." (See also *People* v. *Hillery,* 62 Cal.2d 692, 703 [7] [44 Cal.Rptr. 30, 401 P.2d 382]; *People* v. *Robillard,* 55 Cal.2d 88, 95 [5] [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086].)

Evidence of the circumstances at the time of the killing, as well as the circumstances before and after the killing, is competent to show deliberation and premeditation. (*People* v. *Sears,* 62 Cal.2d 737, 743 [6] [44 Cal.Rptr. 330, 401 P.2d 938]; *People* v. *Caritativo,* 46 Cal.2d 68, 72 [4] [292 P.2d 513].)

The manner and means employed to accomplish the killing are also important considerations in determining the degree of murder. (*People* v. *Guldbrandsen,* 35 Cal.2d 514, 520 [3] [218 P.2d 977]; *People* v. *Steward,* 156 Cal.App.2d 177, 184 [7] [318 P.2d 806].)

The record shows that defendant coldly, dispassionately, and without mercy murdered his victim. As hereinabove indicated, defendant left his apartment with his newly purchased .22 caliber automatic rifle and went to the service station operated by the victim at a time when other customers were unlikely to be there. He purchased a dollar's worth of gasoline. The victim chatted with defendant and asked him how his children were. After the gasoline was put in the car, defendant asked for some cigarettes. When the victim went inside to obtain a package, defendant reached inside the car, took his rifle from the floorboards in the back of the car, and followed him. Once inside, he told the victim he was going to

trial, which could in any way have any effect on the decision of this Court to grant the defendant's request?

MR. STONE: I have no knowledge.

THE COURT: Do you know of anything?

MR. WOLFE: I know of nothing.

THE COURT: Under those circumstances, the Court will approve the waiver of a jury trial as to the entire case as requested. That motion then will be granted at the request of the defendant.

rob him, and when the victim turned, defendant started shooting. He shot all six shells, four bullets striking the victim. When the victim did not fall and reached for the rifle, defendant struck him with it. The victim then slumped to the floor, and defendant poured gasoline over him, took the contents of the cash register, lit the gasoline on the victim's body, and fled.

There is no merit in defendant's argument that in view of his mental condition the doctrine of "diminished responsibility" should be a factor and that thus the evidence is insufficient to show deliberation and premeditation.

■ A claim of diminished responsibility is defensive matter and must be raised by the defendant in the trial on the issue of his guilt. (See *People* v. *Henderson,* 60 Cal.2d 482, 490-491 [5, 6] [35 Cal. Rptr. 77, 386 P.2d 677].) ■ In the present case, no evidence entitling defendant to rely on such defense was introduced during the guilt phase. The reports of the medical experts apparently relied on by defendant were introduced during the penalty phase. Accordingly, the doctrine is inapplicable here.

Even assuming, however, that the medical reports were introduced during the guilt phase, they would not support defendant's contention.[2] Such reports and the reasonable infer-

---

[2]The report of Dr. Toller reveals the following: "On direct examination he is found to be in contact with his environment, he knows the nature of the charges against him. . . .

". . . . . . . . . . .
"He could think quickly and easily, there was no blocking of thought or autistic thinking. There were no delusions or hallucinations.

"His memory for remote events was sharp, he could remember dates and names. He was given two intelligence tests and scored an I.Q. of 75-82.

"On the Bellvue Verbal test, his deficiencies were in general knowledge and abstraction. He scored highest in comprehension, arithmetical reasoning and retention."

The following is a pertinent portion of Dr. O'Brien's report: "Upon interview, I found the defendant to be an ambulant, well-nourished and developed white male, who appeared to be about his stated age of 22 years. He was neat and clean in personal appearance and attire and quiet, cooperative, and serious in manner. He understood questions readily and responded to them promptly, coherently, relevantly, and adequately, except when the question concerned the crime. To such a question, he responded, 'I don't know nothing about it, because I did not do it. They tell me I shot somebody and burned him; that's all I know about it.'

". . . . . . . . . . .
"The defendant was quiet and normally composed throughout the interview. He is estimated to be of dull normal intelligence. He did not manifest any unusual ideas or beliefs or other evidences of insanity. His responses were coherent and relevant and without evidence of any disorder in his thought processes. He understands the nature and the quality of the offense with which he is charged, that it would be wrong to commit

ences to be drawn therefrom support the conclusion that defendant possessed sufficient mental capacity to commit a deliberate and premeditated murder and, accordingly, would not entitle him to rely on the doctrine of diminished responsibility.

Third. *That his statements were improperly received in evidence.*

The record shows that while defendant was in custody in Bakersfield on another charge, Sergeant Hall, of the Stanislaus County sheriff's office, went to the Kern County jail to question him about his involvement in the killing of Mr. Inman.

Before questioning defendant, Sergeant Hall told him that he had a right to an attorney and did not have to make any statement to the police if he did not desire to do so, and defendant said, "I know about that."

Defendant was then taken to a small interrogation room, where Lieutenant Kilroy was sitting. As Sergeant Hall and defendant entered the room, Sergeant Hall told the lieutenant that he had advised defendant of his rights and that defendant had stated he knew about them. Lieutenant Kilroy said to defendant, "You want to remember this, Leo, as we go along," and defendant nodded in an affirmative manner.

The interview with defendant commenced about 2:10 p.m., and he was questioned until 3 o'clock, at which time a 15-minute recess was taken when defendant indicated he wanted a drink and wished to use the restroom. During the questioning, defendant denied any involvement in the crime.

When interrogation was resumed at 3:15, defendant said he would like to confer with an attorney before he made any statement. He was asked if he planned, after being returned to Modesto, to obtain a private attorney or to utilize the services of the public defender, and he said he would probably utilize the services of the public defender. He was asked if he had a particular attorney in Kern County he wanted to call or have the officers call, and he said that he did not have an attorney and did not know any attorney to contact.

There was no refusal by the officers to call an attorney, and Sergeant Hall testified that defendant was not prohibited from contacting an attorney and was not told no attorney

such an act, and that in the event he is convicted of having done so, he will be liable to punishment. He understands the function of defense counsel and would be able to cooperate with such counsel in his own defense. It is my opinion that he is legally sane at this time, and that he was legally sane at the time of his alleged commission of the offense."

would be contacted for him until after he had talked with the officers.

The officers questioned defendant until approximately 4:10 p.m., during which time defendant voluntarily talked with the officers but made no admissions or incriminating statements.

As the interview terminated, defendant stated that he would like to return to his cell, so that he could think it over, and he requested that the officers obtain for him, from his property in the Kern County jail, pictures of his children. This was done.

Almost three hours later, defendant was again brought to the interrogation room. At that time he said he wanted to talk with his mother before making a statement. The officers said it should be his decision and that his mother could not make the decision for him. They used a similar argument when he said he would like to talk with his wife and his father.

Thereafter, questioning was resumed, and during this interview defendant eventually confessed that he had robbed and killed Mr. Inman.

Defendant was returned to Modesto the following day. On the way, he voluntarily made another confession to the officers transporting him.

In Modesto, after conferring with his mother for about an hour, defendant made a lengthy statement, which was tape recorded. At that time the following proceedings occurred: "Q. [By SERGEANT HALL] Now, Leo, as I told you down in Bakersfield about your rights to an attorney and statement and such as that, you remember my telling you that when we came down the hallway there? A. Yes, sir. Q. All right. And you understand that you have these rights? A. Yes, sir."

Defendant thereafter proceeded to make his statement, with no further request for an attorney.

The United States Supreme Court recently held, in *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], that before an accused is subjected to interrogation, he must be informed in clear and unequivocal terms of his right to remain silent; that the warning must be accompanied by an explanation that anything said can be used against him in court; that he must also be clearly informed that he has the right to consult with an attorney and to have the attorney with him during interrogation and that if he is indigent, an attorney will be appointed to represent him if

desired; that if the accused indicates in any manner, either prior to or during questioning, that he wants to remain silent, the interrogation must cease; and that if he states that he wishes an attorney, the interrogation must cease until an attorney is present.

Defendant was advised that he had a right to an attorney and did not have to make any statement to the police if he did not want to do so, but it is clear that the warning given him fell short of that now required by the *Miranda* case and that under the rule established in that case defendant's interrogation should have ceased when he said he wanted to talk with an attorney before giving a statement.

Although defendant's conviction was not final before the decision in *Escobedo* v. *Illinois,* 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], his trial began before the decision in *Miranda.* Accordingly, he is entitled to the benefit of the rules laid down in *Escobedo,* but is not entitled to the benefit of the holding in *Miranda.* (*People* v. *Rollins,* 65 Cal.2d 681 [56 Cal.Rptr. 293, 423 P.2d 221].)

Under the *Escobedo* rules, it was not necessary that the warning to defendant include advice that he was entitled to have an attorney present at his interrogation and that if he was indigent, an attorney would be appointed for him if desired. (*Escobedo* v. *Illinois, supra,* 378 U.S. 478; *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].)

Likewise, defendant is not entitled to the benefit of the rule that once an accused states he wishes an attorney, interrogation must cease until an attorney is present. However, he requested an attorney while he was in custody and while the police were carrying out a process of interrogations that lent itself to eliciting incriminating statements, and therefore under *Escobedo* he was entitled to have an attorney present at the interrogation (378 U.S. at pp. 484-487) unless he had waived the right (p. 490, fn. 14). We must therefore determine whether a waiver took place.

Defendant is also entitled to raise generally the question of the voluntariness of his confession. (*Johnson* v. *New Jersey,* 384 U.S. 719, 730 [16 L.Ed.2d 882, 86 S.Ct. 1772].)

We have held that the denial of the right to an attorney by evasion or neglect of the suspect's request for an attorney is just as much a constitutional violation as a denial by explicit rejection. (*People* v. *Anderson,* 63 Cal.2d 351, 361-

362 [9] [46 Cal.Rptr. 763, 406 P.2d 43]; see also *People* v. *Luker*, 63 Cal.2d 464, 474 [47 Cal.Rptr. 209, 407 P.2d 9].)

■ In the present case, however, the officers did not deny defendant's request by explicit rejection or by evasion or neglect. On the contrary, the record shows that they asked him if there was any attorney in Kern County he wanted to call or have them call for him, and he told them he did not know any attorney to contact. They then continued to question defendant for an additional hour, during which time he freely gave his answers to their questions, maintaining his innocence throughout.

Defendant was then, at his request, allowed to return to his cell to think it over, and he was not asked any further questions for a period of almost three hours. This was ample time for defendant to have "thought it over." Under the circumstances, by subsequently making a confession without having again requested an attorney, he must be deemed to have waived his right to an attorney and voluntarily confessed.[3]

---

[3]With respect to defendant's request for an attorney, Sergeant Hall testified, as follows:

THE COURT: [] Did Mr. Lookadoo [defendant] at any time during the interrogation that you are now referring to, ever make a request to see an attorney or contact an attorney?

A. He said that he would like to confer with an attorney before he made any statement.

THE COURT: He told you that at that time?

A. I believe between the 3 and the 4:10 interview, yes. []

THE COURT: And what did you say in response to that?

A. We asked if he had an attorney retained in Bakersfield.

THE COURT: And what else did you say?

A. And he—to that he replied "No," and we asked him then when we took him back to Modesto, if he had planned on obtaining an attorney, or if he would utilize the services of the Public Defender.

THE COURT: Did he make any particular request to talk to any particular attorney at that time in Bakersfield?

A. No, he did not.

THE COURT: He merely said he would like to talk to the attorney before he made a statement?

A. Yes, this is true.

THE COURT: Did you do anything further in response to that request?

A. We asked him if he had a particular attorney that he wanted to call, or have us contact.

THE COURT: Did you tell him that you wouldn't contact the attorney until after you talked to him?

A. Definitely not.

THE COURT: And did you in any other way—I realize he was incarcerated, but did you in any way prohibit him from contacting an attorney?

A. No, sir.

THE COURT: And at that particular time I take it that you then continued to interrogate him, both after the first interrogation and then beginning at 3:15 until 4:10, you continued to interrogate him, is that correct?

Fourth. *That evidence of statements made by him to a fellow inmate at the jail was improperly admitted.*

Wayne Lynn Grider testified that he was confined in the Stanislaus County jail at the time defendant was held there;

---

A. Yes.

THE COURT: And did he voluntarily talk with you at that time?

A. He voluntarily talked to us all during the period, yes.

THE COURT: [] When he said that he wanted to talk with an attorney before he made a statement, what happened right after that in respect to what was said, that you had apparently now indicated to the Court that he continued to talk to you, even though he said that he wanted to see an attorney before he talked to you?

A. I think I followed you in that he at no time stated that he wanted to have no more conversation with us. We did not force any conversation on him, Your Honor, in any part of our interview, and as our interview terminated just prior to 4:10 P.M., Leo stated that he would like to go back to the cell that he had been in, so that he could think this over.

THE COURT: All right, proceed.

Q. [By MR. WOLFE, district attorney]: Was he permitted then to go back to his cell and think it over?

A. Yes, he said that he would like to get a couple of pictures of his children from his property in the Kern County Jail, and go back to his cell and think this over for an hour or so.

Q. Was he permitted to do so?

A. Yes, and we got pictures of his children out of his property for him.

Q. And after 4:10, when did you next see the Defendant?

A. 6:52 P.M. []

THE COURT: [] To your knowledge did Mr. Lookadoo make a request to make a phone call, or call an attorney or anything prior to the time that you had the conversation at 6:52 in the evening?

A. No, sir, he did not.

THE COURT: Did he express any desires, other than saying that he would like to talk to an attorney before he made a statement? He told you this, is that correct?

A. Yes, he did say this, that he wanted to talk to an attorney. []

THE COURT: And at that time do I gather—you said, "Do you have an attorney here?"?

A. We asked him if he had an attorney in Bakersfield or Kern County that he wanted to contact.

Q. And what did he say in response to that?

A. No, he said that he did not have an attorney. He didn't know any attorney to contact. []

Q. At that time, and I am speaking now in connection with this conversation concerning the request for an attorney, or that he wanted to talk with an attorney, where he expressed the desire to, did you at any time then make any indications or representations to him of any kind, "Well, we want to talk to you and you can talk to an attorney after we talk with you." Did you say anything like that to him?

A. No, sir, not—no, sir, not that he could talk to an attorney after we talked to him, no, sir. We did not make that statement.

Q. And do I gather that having been informed, as you have indicated that you informed him of his rights to counsel, and he having indicated to you that he would like to talk to an attorney before he made a statement, what I guess I am trying to get to is, can you fill the Court in on anything that the Defendant said at that particular time that indicated an indication on his part that he was willing to go ahead and talk with

that during such time defendant approached him in the exercise area and asked him what he thought of defendant's chances of "beating" his case; that he told defendant he did not even know what defendant was in for; and that defendant proceeded to tell him. He then testified as to certain details related to him by defendant.

Mr. Grider testified that no one had suggested that he talk with defendant and that the conversation was started by defendant himself. He said that a representative from the district attorney's office who had seen him talking with defendant asked him if he knew defendant or anything about his case and that he then told him of the conversation.

Defendant contends that the evidence of his statements to Mr. Grider was inadmissible, because the confessions he made to the police were inadmissible due to his having been deprived of counsel at the critical pretrial stage of his case, and his statements to Mr. Grider were made in a continuing pattern of "talking" about the crime, initiated by the police interrogation.

In the first place, as pointed out above, defendant had waived his right to counsel before he confessed to the police, and his confessions to the police were therefore admissible.

Even assuming, however, that such confessions were inadmissible, defendant's statements to Mr. Grider were made

---

you, even though he had requested no attorney, or indicated that he wanted to talk to an attorney at that time, that would cause you to feel, "Well, all right, we will go ahead and talk with the defendant." Was this merely because he wanted to go ahead and voluntarily talk to you and indicated that he would talk to you in spite of that statement?

A. Yes, his answer to our questions came freely. When we got to the point of asking him about the homicide, he denied this part. He made some requests during the period of time that he wanted to talk to his mother before he talked any further to us. []

THE COURT: And what did you say to that?

A. We asked him what difference would that make in any statement that he gave us, what he was to tell us or would not tell us was his own decision, and this was something that we felt would be his decision, that his mother couldn't make this decision for him.

THE COURT: And what did he say in response to that?

A. He stated that he would still like to talk to his mother, and to his wife, and see his children, and too, he indicated that he would like to talk to his father, also.

THE COURT: Do you recall then what you said in response to that?

A. Here again we went back to the point that this was a decision whether he talked to us or not talk to us was a decision that he would have to make, and that we—this was a decision not to be left up to his father or wife.

THE COURT: What did he say in response to that?

A. To these points, this was about the extent of the conversation between this period of time, and he eventually told us that he had shot Mr. Inman.

after the court had appointed counsel for him and under circumstances entirely free of the compelling influence sometimes present in a police interrogation. As a result, it is clear that the statements were not given in the atmosphere condemned by *Escobedo* and *Miranda*. Accordingly, evidence of the statements was properly admitted.

Fifth. *That the trial court committed prejudicial error during the penalty trial.*

 Defendant contends that the trial court abused its discretion in imposing the death penalty. In support of this proposition he argues that the finding of premeditation, on which he alleges imposition of the death penalty was based, was erroneous. This argument, it has been demonstrated above, is without merit.

 Defendant further argues that the court gave no indication that any consideration was given to, or weight placed upon, his mental condition. This argument is likewise without merit.

Although, as stated above, there is no basis in the record for applying the doctrine of "diminished responsibility," it is clear that the trial court carefully considered the evidence of defendant's mental condition and properly exercised its discretion.

In giving its decision, the court stated: "The Court has endeavored to carefully consider all the evidence and the arguments presented as to what penalty should be imposed upon the Defendant for the crime of murder in the first degree. . . .

". . . . . . . . . . . . .

". . . The Court is not unmindful of the apparent lack of high intelligence, or unfortunate economic circumstances of this Defendant. But the law of this land does not authorize or condone the commission of such a crime as here involved because of economic or social background."

Also, during proceedings on the motion for a new trial the judge said, "I have thought about the arguments which you [defendant's counsel] made this morning"; and the record shows that during the morning proceedings defendant's counsel argued at length that in view of defendant's mental condition there was no evidence to sustain a finding of premeditation and the death penalty should not be imposed.[4]

---

[4]Part of the morning proceedings are quoted from the transcript:

MR. STONE: [ ] I submit to Your Honor that there is no evidence to sustain any finding of premeditation of that nature. In the first instance

The judge also pointed out during the proceedings on the motion for a new trial that the killing had occurred during the course of an armed robbery, and said: "And I want to make it clear also that this Court did consider the circumstances of this defendant, the circumstances under which he grew up, and the thing is this, that this is not a circumstance that is just peculiar to this defendant. There are lots of people who have lived in rather poor background and have grown up and become good, solid citizens in this community, in spite of unfortunate economic circumstances. I just can't help but feel under the circumstances here that as long as we have the death penalty in this state, if it is to mean anything, and if the will of the people and the majority of the people who want it, want to continue to have it, and until some other extreme penalty or method is devised by the people of this

---

this defendant mentally is a child. He is not capable of planning that far ahead. []

[ ] this defendant, this young man with a child's mind [ ] acted like a child throughout. []

Now, when we wish to continue on this matter of premeditation, consider the defendant's mentality. He is in popular jargon or popular language, a moron. The report of Dr. Bramwell [a psychiatrist who examined defendant at the Juvenile Hall when he was not quite 16] indicates an I.Q. of 65 [The report shows an I.Q. of 69.] and the two examining psychiatrists indicate 75, around 75. [Dr. Toller's report shows that defendant scored an I.Q. of ''75-82'' on the intelligence tests given him.] His mental age is well under the age 18 [] the age at which a person may be executed in this state. I realize [] that the law refers to chronological age, but nevertheless this defendant's mental age should have some bearing upon [] his criminal responsibility at least insofar as something so grave as capital penalty is involved. []

THE COURT: [] Do you think there is a difference in this particular case and the case where a perfect stranger would go into the gasoline station for the purpose of robbing Mr. Inman?

MR. STONE: No, Your Honor, I do not.

THE COURT: You don't think there is any difference at all?

MR. STONE: No, if you consider the mentality of this defendant.

THE COURT: You don't think that the defendant was acquainted with Mr. Inman?

MR. STONE: Yes, he was, obviously.

THE COURT: Do you think that this man knew the defendant?

MR. STONE: Yes.

THE COURT: And you think that if he went in there for the purpose of robbing Mr. Inman, that he must also have known, and taking the gun calculatingly into the place with him, and after he had Mr. Inman go in to get some cigarettes [] do you think at that time when he went inside the station, that in order to effectuate a robbery, this defendant knew that he had to kill Mr. Inman to do it?

MR. STONE: No.

THE COURT: Well, that is where you and I disagree, because I think the evidence shows that fact, and I am absolutely convinced that this is what this defendant believed. []

MR. STONE: [] Apparently the Court is holding this man mentally to the same level of responsibility that he is accustomed in dealing with people in everyday life.

state, that this Court simply has no alternative but to allow the penalty to stand under the circumstances.

"I want to say now, if there were any questions that the Court were to sit here and say, 'Fine, it is great to be merciful, it is great to be considerate of other people,' and all of this, there must come a time, at least under the facts of this particular case in which this Court cannot in my judgment abdicate what I think is my duty as a trial judge in this case, and the facts and evidence of this case, and say that I can in the name of mercy or in kindness modify this particular sentence."

The judge's statements clearly show that he conscientiously selected the penalty in his capacity as the officer of the People charged with that power and duty. It is clear that he properly exercised his duty and discretion as the trier of fact. (See *People* v. *Lindsey,* 56 Cal.2d 324, 328 [2] [14 Cal.Rptr. 678, 363 P.2d 910]; *People* v. *Cartier, supra,* 54 Cal.2d 300, 311-313 [8] [5 Cal.Rptr. 573, 353 P.2d 53].)

---

THE COURT: No, I am not doing that, Mr. Stone, and I don't want to do that. I only want to do this: Do you not have to look at the actual evidence that was presented, and in the light of what was done, and calculate that the defendant was as capable of doing that which he did as anybody else.

MR. STONE: Well, capable, yes, but we are talking about what went on in his mind, the purpose of it. You are attempting to determine what went on in this childish mind on the basis of what you judge goes on in the minds of the average rather intelligent person with whom you deal from day to day. []

THE COURT: [] Look at the time [] the evidence appears to show that it occurred, somewhere around 6:00, 6:40 or 6:50 in the morning [ ] when discovery was highly unlikely from the standpoint of anyone else pulling into the station, for example.

[] if you look at the total scheme of the effect of waiting, and the very thing that was done, and the manner in which it was done, [] it was done with deliberation and calculation. []

MR. STONE: [] I would like to say further that the defendant's mentality, because the type of crime that he did commit—and I feel that this was—I hesitate to use the word, and in an incident of this nature, a childish crime, a foolish—a silly crime to take such horrible risk for the three or four hundred dollars that the Court feels that the defendant thought was there.

Certainly the defendant could have committed a robbery elsewhere, where he was not known, and I can truthfully say with no attempt at sarcasm or humor, that only a moron, a person of subnormal mentality would have committed a robbery of this nature. A person of anywhere near adequate intelligence, if he were so criminally inclined and wanted to rob a gas station, could have easily robbed—I don't know how many gas stations in the area, but there must be a hundred, and with an equal chance of getting the same amount of money, so that I feel the Court again, that only a mentally subnormal person would have committed a robbery of this nature, and I might add also, Your Honor, that only a person of subnormal childish mentality would have made the confessions that this man had made to Grider [a fellow prisoner] and others [].

Sixth. ▮ *That the trial court committed prejudicial error in considering the pardoning power of the Governor and the reviewing function of the Supreme Court when imposing the death penalty.*

This contention is likewise devoid of merit. Defendant argues that the court committed prejudicial error by placing great weight on the pardoning power of the Governor and the reviewing function of this court.

Initially, the record fails to show that the trial judge placed "great weight" on the pardoning power of the Governor and the automatic review by this court.[5] At most, he was acknowledging the fact that man is fallible and that even as careful as he was in applying the law, he was capable of making an error.

Furthermore, *People* v. *Morse*, 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33], is inapplicable to the present case. This court there held that in the penalty phase of a first degree murder trial it was reversible error to give an instruction, and to allow evidence and argument, which permitted the *jury* to consider the possibility that the Adult Authority might at some future date grant a parole to the defendant if he were given a life sentence, and that whether or not a prisoner should be granted parole is a matter within the expert judgment of the Adult Authority and is not within the jury's province.

In the present case there was no jury, and there was no improper instruction or argument concerning parole or otherwise.

In the *Morse* case this court said: "Both statements tend to diminish the *jury's* sense of obligation; they both infuse into the issue factors that do not belong there. . . .

"We have no doubt that these errors in directing the attention of the *jury* to the roles of Adult Authority, judge and Governor, by means of argument, evidence and instruction in the instant case, prejudicially influenced the *jury*." (Italics added.) (60 Cal.2d at p. 652.)

It would be unreasonable and unrealistic to apply the same reasoning to the trial court. The judge by reason of his position would be aware of the very things that this court has held tend to diminish the jury's sense of obligation.

---

[5]At the time he announced his decision, the trial judge stated: "Fortunately, due to the frailties of this Court, the finality of its judgment by law rests with the Supreme Court and the Governor of this State, after careful review."

The court did not commit prejudicial error in the penalty trial.

Seventh. *That this court should exercise its judgment as to the choice of punishment.*

There is no merit to this contention. This court has uniformly rejected requests to reduce the penalty from death to life imprisonment. No error contributed to the choice of penalty, and we have repeatedly held that the trier of fact has the sole responsibility and absolute discretion to select the penalty for first degree murder. (*People* v. *Mitchell,* 63 Cal.2d 805, 821 [48 Cal.Rptr. 371, 409 P.2d 211]; *People* v. *Howk,* 56 Cal.2d 687, 699-701 [3-5] [16 Cal.Rptr. 370, 365 P.2d 426] and cases there cited.)

The judgment is affirmed.

Traynor, C. J., Mosk, J., Burke, J., and Sullivan, J., concurred.

PETERS, J.—I dissent.

The defendant was arrested in Kern County for an offense not here involved. The instant crime had occurred in Stanislaus County. Sergeant Hall, a law enforcement officer of Stanislaus County, came to Bakersfield for the purpose of interrogating defendant about the killing here involved. When Hall arrived defendant was called into the interrogation room to be questioned by Hall and the other officers. He was told of his right to an attorney and of his right to remain silent. He was then vigorously interrogated for 50 minutes. He consistently denied complicity in the Stanislaus County murder. During this interrogation a brief recess was called, and then the questioning was renewed. Defendant at that time stated that he wanted an attorney before making a statement. The police did not directly deny this request but asked defendant if he had an attorney in Bakersfield or Kern County and whether he intended to use a private attorney or the public defender in Stanislaus County. Upon receiving the reply that defendant had no Kern County lawyer and probably would use the public defender, the interrogation continued, and defendant continued to deny complicity in the murder. He then asked to be returned to his cell to think the matter over. After three hours he was again taken to the interrogation room. He immediately told the officers that before he made a statement he wanted to talk to his mother. The interrogating officers told him that that was

not necessary because the decision was his alone. Then defendant requested permission to consult with his wife, or with his father, but was dissuaded by the same arguments used to deny him access to his mother. Thereafter, in response to further questioning he confessed.

Looking at the interrogation in its entirety, as we are required to do, the conclusion is inevitable that the confession here involved was secured by evasion and artifice and certainly in violation of the fundamental philosophy behind *Escobedo* v. *Illinois,* 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], and *People* v *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].

The police were dealing with a young man of limited intelligence, a young man who was described by the court-appointed psychiatrists as being of "dull normal intelligence" and as being "in the borderline mental defective groups." Although defendant was told of his right to an attorney, the police failed to honor his request for one and continued to interrogate him. Then defendant demanded the right to see his mother, his wife, or his father, before making any further statements. The granting of these requests was avoided by specious arguments.

This factual situation falls directly within the rule stated in *People* v. *Anderson,* 63 Cal.2d 351 [46 Cal.Rptr. 763, 406 P.2d 43]. There the court stated that the defendant had requested counsel, and (p. 362) that the "police improperly persisted in questioning him. Although upon the commencement of the inquiry defendant did not immediately demand counsel, but said that he could not remember what had happened, he did not thereby forfeit his right to counsel. *Before he gave the incriminating statements he asked for counsel; the request does not lose its force because the questioning continued. The denial of the right to counsel by evasion or neglect of the suspect's request for counsel constitutes no less a constitutional violation than a denial by explicit rejection.* In *Escobedo* the United States Supreme Court held that defendant's statements uttered during the prearraignment accusatory stage cannot be admitted into evidence if, at that stage, he has been denied his right to counsel. Since the police, by ignoring defendant's request for counsel at the accusatory stage, deprived him of his constitutional right to counsel, the admission of statements elicited during that time was erroneous." (Italics added.) (See also *People* v. *Luker,* 63 Cal.2d 464, 474 [47 Cal.Rptr. 209, 407 P.2d 9].)

The majority, in apparent recognition that the interrogation should not have proceeded after defendant had made it clear that he wanted an attorney or a member of his family with whom to consult, urge that there was a waiver, because defendant continued to talk after his demands were parried and evaded. The quotation from *Anderson, supra,* demonstrates that no such inference is permissible. Although defendant continued to talk after he was unable to get a lawyer, he continued to deny complicity, and then, when called back to the interrogation room, he made it clear that he did not want to talk until he had consulted with some member of his family. The police parried the last request by the specious argument that the decision was his and that his family could not assist him. To hold that there was a waiver under such circumstances is contrary to the decided cases. A waiver must be knowingly and intelligently made. (*Carnley* v. *Cochran,* 369 U.S. 506 [8 L.Ed.2d 70, 82 S.Ct. 884].) It is also contrary to the fundamental theory of *Escobedo* and *Dorado, supra.* The basic concept behind those cases and their numerous progeny, is that it is unfair, and encourages coercion, to continue to interrogate a layman in the unfriendly atmosphere of the stationhouse, after he has clearly indicated that he does not want to talk until he has consulted with an attorney or his family. The police, when such a request is made, may not continue to interrogate unless the accused makes a knowing and intelligent waiver. They cannot dissuade him by specious and evasive arguments and continue to interrogate him with the intent of eliciting incriminating statements. They must grant his request or stop the interrogation.

It was clearly error to admit the confession. Even if that error were not per se reversible (but see *Payne* v. *Arkansas,* 356 U.S. 560 [2 L.Ed.2d 975, 78 S.Ct. 844]; *Gideon* v. *Wainwright,* 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792, 93 A.L.R. 2d 733]; *Tumey* v. *Ohio,* 273 U.S. 510 [71 L.Ed. 749, 47 S.Ct. 437, 50 A.L.R. 1243]; *Lynumn* v. *Illinois,* 372 U.S. 528 [9 L.Ed.2d 922, 83 S.Ct. 917]; *Malinski* v. *New York,* 324 U.S. 401 [89 L.Ed. 1029, 65 S.Ct. 781]; *Spano* v. *New York,* 360 U.S. 315 [3 L.Ed.2d 1265, 79 S.Ct. 1202]; *Haynes* v. *Washington,* 373 U.S. 503 [10 L.Ed.2d 513, 83 S.Ct. 1336]; *Jackson* v. *Denno,* 378 U.S. 368 [12 L.Ed.2d 908, 64 S.Ct. 1774, 1 A.L.R. 2d 1205]; *Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]), it was clearly prejudicial (*Chapman* v. *California, supra*). It was not cured by the subsequent confes-

sions. Those confessions must be deemed to have been induced by the earlier improper one (*People* v. *Spencer, ante,* p. 158 [57 Cal.Rptr. 163, 424 P.2d 715]).

I would reverse the judgment.

Tobriner, J., concurred.