[Crim. No. 1324.   Fourth Dist.   Dec. 16, 1957.]

THE PEOPLE, Respondent, v. AMELIA VERONICA STEWARD, Appellant.

*Assigned by Chairman of Judicial Council.

John R. Sorbo, under appointment by the District Court of Appeal, for Appellant.

Edmund G. Brown, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

WAITE, J. pro tem.*—Appellant was charged with murder, the information alleging that she did "wilfully, unlawfully, feloniously and with malice aforethought, kill and murder one Carol Steward, a human being." The victim was the appellant's daughter, and was 2½ years of age at the time of her death. Pleas of not guilty and not guilty by reason of insanity were entered, the latter plea being withdrawn before trial. A jury found appellant guilty of murder as charged in the information, determined the degree thereof as murder of the first degree and fixed the penalty at life imprisonment. This appeal is from the judgment and from an order denying a motion for a new trial.

In his opening brief appellant's counsel concedes that substantial evidence supports the jury's conclusion that appellant committed the killing and the only contentions raised on appeal are: (1) That the evidence is insufficient to support the conviction of first degree murder in that no substantial evidence of deliberation or premeditation appears in the record. (2) That because of such insufficiency a reduction of degree should be ordered pursuant to Penal Code, section 1181, subsection 6.

Although there is considerable conflict in the evidence the salient facts are as follows: Appellant and Mrs. Agnes Hosford had been acquainted for approximately three years from the time they first met in Bremerton, Washington, and after they had moved to the National City area in San Diego County where they lived together. The two women had many differences and on occasion appellant had struck Mrs. Hosford. Mr. James Auerbach, operator of a bar, had frequently seen appellant and Mrs. Hosford in his establishment. The pair argued constantly while in said bar and once in December, 1956, appellant resorted to physical violence against Mrs. Hosford. At that time Mr. Auerbach heard appellant say: "I will kill the Lesbian son-of-a-bitch." Mr. Auerbach never saw Mrs. Hosford attack appellant and it was generally appellant who was the aggressor in the quarrels between the two.

---

*Assigned by Chairman of Judicial Council.

On February 18, 1957, appellant, Mrs. Hosford and three of appellant's children, Carol, aged 2½ years, Sheryl, aged 18 months and Merrill, aged 5 months, were living together in a house in National City. On that date at about 10:30 p. m. appellant left the house, leaving Mrs. Hosford and the children behind. Appellant went to the Corral, a National City beer bar, where she remained long enough to become acquainted with two sailors in whose company she consumed some beer. Shortly after midnight appellant and the sailors went across the street to the Brown Bear, a bar which served hard liquor, and there appellant consumed some drinks of vodka and orange juice, commonly known as "screwdrivers." The group then returned to the Corral where they remained until shortly before 2 a. m. Appellant meanwhile consumed some more beer. Upon leaving the Corral one of the sailors purchased a bottle of vodka and the three drove together to appellant's house.

When the group arrived at the house Mrs. Hosford was sleeping on a couch in the front room and appellant aroused her, using considerable profanity in doing so. At that time appellant was "probably a little drunk" but she was not staggering and she spoke clearly. After a few minutes one of the sailors left the house, went to his car and did not return. Appellant opened the bottle of vodka using a heavy-handled jack-knife type of knife and poured drinks for the group, after which she went into the bedroom and returned with Carol, her daughter, who was wearing a yellow nightgown. Appellant stood Carol on a kitchen chair, lighted a cigarette and placed it in Carol's mouth, forcing her to puff the cigarette by squeezing the back of the child's neck. Immediately after doing this appellant accused Mrs. Hosford of having taught the child to smoke and to indulge in other bad habits, and seizing the knife which she had used to open the bottle of vodka, appellant began jabbing Mrs. Hosford in the chest pulling her hair and cutting her about the face and body. Appellant said: "I am going to cut your heart out and make you eat it" and "You old whore, I ought to kill you" and "I am going to kill you," whereupon the sailor who had remained after the departure of his comrade said: "Oh, oh, I got in the wrong place." He thereupon retrieved the bottle of vodka and departed to join his colleague in the car and the two of them drove away. Meanwhile Mrs. Hosford had managed to free herself from appellant's grasp, retreated from the house and did not return until about 2 o'clock the following afternoon.

Shortly after 4:45 a. m. on the morning of February 19, 1957, Mrs. Freda Horner, appellant's neighbor, arose to go to work but first went outside to dispose of some garbage. She heard loud sounds from a radio emanating from appellant's house and saw a woman clad in a light colored duster sitting in the kitchen. At about 8 a. m. on the same day appellant went to the house of Mrs. Bonnie Underwood, her next-door neighbor, and said to Mrs. Underwood: "Bonnie, I can't get my baby awake." At the time appellant was wearing a blue duster and her hair was combed. Mr. and Mrs. Underwood accompanied appellant to her house and into the bedroom. Two of appellant's children were in cribs and Carol, the third child, lay in a bed with the bed covers pulled up around her. Carol's eyes were open and there was a gash in her forehead. Mrs. Underwood immediately telephoned Dr. Jacob Teske, a medical practitioner, who arrived at appellant's house shortly after 8 a. m. Dr. Teske went into the bedroom and uncovered Carol, noting that she had a large irregular wound in her left chest, that her face had been slashed and that she was dead. Dr. Teske noticed further that there was not a very heavy concentration of blood either on Carol's "shirt or on the bed sheets." Also there were no noticeable blood stains or spatters on the body and the various wounds were fairly clean. Considering the type of wounds Dr. Teske's opinion was that there should have been more blood.

Officers Owen and Monteer, both of the National City Police Department, arrived at appellant's residence shortly after 8:30 a. m. the same morning. In the kitchen Officer Owen noticed a white cabinet on which there was considerable blood-colored discoloration which appeared to have been wiped and cleaned. Officer Monteer observed what appeared to be blood stains above the sink, on the walls and on the floor and it appeared that an attempt had been made to clean the area by wiping it. On a shelf were four knives, including a jack-knife type which appeared to have been washed; it was damp inside where the blades closed and near the large blade was a small piece of meaty tissue. The police criminologist later tested the knife and found there was blood on it. Officers Owen and Monteer found on the floor of the bathroom sheets, slips and skirts all with discolorations and stains on them which appeared to be blood and Officer Monteer noticed a large spot of blood in the shower. On the toilet stool they found some garments for a small child and these also were stained and damp and appeared to have been

soaked in water. One of the garments was a child's yellow nightgown.

On February 19, 1957, Dr. James Weston, pathologist for the coroner of San Diego County, conducted an autopsy on the body of the dead child. His examination revealed that the body was marked externally by lacerations, scratches and deep and penetrating wounds varying in size from about one-half inch in diameter up to about six inches in diameter and covering an area extending from the forehead over the face, upper lip, chin, both sides of the neck, the medial portion of the chest immediately over the heart and the upper abdomen. The chest wound was in the left chest over the heart where there was a large gaping rent. This wound had penetrated through the cartilage which attaches the ribs to the sternum, had separated the several ribs from the sternum and then extended into the underlying pulmonary tissue or lung and into the heart. It had penetrated the chest cavity and windpipe and the resulting hemorrhage had completely collapsed the left lung. Dr. Weston counted 38 distinct wounds and it was his opinion that the large hole in the left chest represented a series of blows in one area rather than one separate wound. It was further his opinion that all the wounds were probably caused by a blade-like weapon and that they could have been caused by a knife such as the one found in appellant's kitchen.

On February 19th and the following day Officer Monteer interrogated appellant at the National City police station, at which time she told him that she had gone to bed with Carol at approximately 10 or 10:30 on the preceding evening; that she had not gone out that night, had had no visitors and had not awakened until 8 a. m. She said that a cut which appeared on one of her thumbs must have been caused by a pair of scissors while cleaning the cuticle of her nails. When informed that a murder complaint would be lodged against her appellant said nothing and showed no emotion.

At the trial appellant testified that she went to the Corral about 10 or 10:30 on the evening of February 18th where she met two sailors and accompanied them to her home where they talked to Mrs. Hosford. Appellant testified that she and Mrs. Hosford did not argue that night although they had disagreed during the day. According to appellant Mrs. Hosford suddenly started screaming and ran out of the house whereupon one of the sailors said "Oh my God" and both sailors left. Appellant claims that the next thing she re-

membered was regaining consciousness in the kitchen and seeing two hands holding the end of a knife. She could not see the blade but she grasped the hands and tried to get the knife at which time Carol fell between the white cabinet and the wall. Appellant claims to have picked up the child, taken her into the bedroom and placed her on the bed. Later appellant noticed that the sheets on the bed were wet so she changed the sheets and also changed her clothes and Carol's clothes. Then appellant, according to her testimony, found a knife on the floor so she picked it up and noting that the kitchen was "all messed up" she proceeded to clean it. Appellant testified that she believed she passed out because she was hit on the back of the head and that she did not learn that her daughter was dead until the morning of February 19th when someone at the National City Police Station told her that fact.

A homicide is murder of the first degree when the accused, as the result of deliberation and premeditation, intended to take unlawfully the life of another. (Pen. Code, § 189; *People* v. *Sutic*, 41 Cal.2d 483, 491 [261 P.2d 241].) Appellant concedes that there is ample evidence of deliberation and premeditation here if the victim had been Agnes Hosford and admits that the record would support a conviction of first degree murder if Mrs. Hosford had been killed instead of Carol Steward. But appellant contends that in order to support such a conviction based on the death of Carol Steward it is necessary to resort to the doctrine of transferred intent and that such doctrine does not apply to the facts of this case. The law on the subject of transferred intent is that:

"Where a person purposely and of his deliberate and premeditated malice attempts to kill one person but by mistake or inadvertence kills another instead, the law transfers the felonious intent from the object of his assault and the homicide so committed is murder in the first degree." (*People* v. *Suesser*, 142 Cal. 354, 367 [75 P. 1093]; *People* v. *Sutic*, *supra*, pp. 491-492.)

It is contended that if, for example, appellant had lunged at Mrs. Hosford with the knife and had stabbed Carol inadvertently when Mrs. Hosford stepped aside, the doctrine would apply but that the record is barren of such evidence. We agree with appellant that the facts before us do not warrant the application of the doctrine but we further agree with the respondent that it is unnecessary to resort to such

theory and that the rule of transferred intent has no bearing on this case.

Here the jury was fully justified in believing that appellant had deliberately formed an intent to kill and that once Mrs. Hosford had escaped from her grasp appellant then directed her murderous assault against the child. ■■ It is the exclusive province of the jury to determine whether the killing was the wilful, deliberate and premeditated act of the defendant (*People* v. *Wells,* 10 Cal.2d 610, 624 [76 P.2d 493]) and to justify the reversal of a judgment of conviction the record must clearly show that the evidence could not be interpreted as supporting the verdict (*People* v. *Tedesco,* 1 Cal.2d 211, 219 [34 P.2d 467]; *People* v. *Eggers,* 30 Cal.2d 676, 685 [185 P.2d 1]).

■ While it is true that as to all factual issues resolved by a jury the evidence upon which the determination is made is subject to review on the question of its legal sufficiency to support the verdict (*People* v. *Holt,* 25 Cal.2d 59, 90 [153 P.2d 21]), nevertheless this court may not, in reviewing the evidence, substitute its judgment for that of the jury and where there is substantial evidence in support of the jury's verdict its determination must be upheld (*People* v. *Smith,* 15 Cal.2d 640 [104 P.2d 510]; *People* v. *Holt, supra; People* v. *Eggers, supra*). ■ Applying these rules, the evidence justifies the conviction of appellant for murder of the first degree if it shows that the killing was the result of a clear, deliberate and premeditated intent to kill. ■ In determining this question we are entitled to consider what occurred at the time of the killing, if indicated by the evidence, as well as what was done before and after that time (*People* v. *Eggers, supra,* p. 686).

The circumstances of the instant case amply justify the inference drawn by the jury that appellant was possessed of a wilful, deliberate and premeditated purpose to kill the deceased. The vicious form of the assault, the type of weapon employed and the manner of its use, the nature of the multiple wounds inflicted and the fact that the attack was unprovoked all are matters which properly could be considered by the jury. (*People* v. *Isby,* 30 Cal.2d 879, 888 [186 P.2d 405].) Also, as the court said in the Isby case: "It does not aid defendants . . . to argue that there was no proof of a motive for the killing. ■ The presence or absence of a motive *is* only one factor to be considered by the jury in connection with the other factors in the case." This

rule applies with equal force in the matter before us and disposes of appellant's contention that absence of motive in the killing of her child requires a reduction in the degree of murder.

█ Here the evidence conclusively shows that appellant without cause or provocation inflicted 38 separate and distinct stab wounds upon her victim, ranging from the forehead to the abdomen, including wounds on the face, upper lip, chin, both sides of the neck and the numerous deep and severe cuts in the chest over the heart. █ This evidence is sufficient to bring the case within the rule that ''where one assaults another violently with a dangerous weapon and takes his life, the presumption is that he intended to cause death or great bodily harm.'' (25 Cal.Jur.2d § 29, p. 519.)

█ And where, as here, the assault was made in a manner that was reasonably certain to produce death, and which actually did cause death, the only rational presumption to be drawn therefrom is that the assailant intended to take the life of the person attacked. (*People* v. *Isby, supra,* p. 889.)

█ It is true that '' 'When a killing is proved to have been committed by the defendant, *and nothing further is shown,* the presumption of law is that it was malicious and an act of murder; but in such a case the verdict should be murder of the second degree, and not murder of the first degree' '' (Emphasis ours). (*People* v. *Wells,* 10 Cal.2d 610, 616-617 [76 P.2d 493].) In the instant case, however, *much more* appears than the isolated fact that the deceased was unlawfully killed by appellant, and considering the law, together with the evidence hereinbefore summarized, the conclusion is inescapable that the jury was warranted in its implied finding that appellant committed a wilful, deliberate and premeditated killing within the statutory definition of murder of the first degree.

We conclude that the evidence before us is more than ample to support the conviction of murder of the first degree and that a reduction in degree pursuant to Penal Code setion 1181, subsection 6, should not be ordered.

The judgment and order are affirmed.

Barnard, P. J., and Mussell, J., concurred.