Charles William MURRY,
Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 5458.

Supreme Court of Wyoming.

Jan. 23, 1986.

Wyoming Public Defender Program: Leonard D. Munker, State Public Defender, Martin J. McClain, Appellate Counsel, Cheyenne, and H. Clay Whitlow, Denver, Colo., for appellant.

A.G. McClintock, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., Crim. Div., John

Renneisen, Sr. Asst. Atty. Gen., Michael A. Blonigen, Asst. Atty. Gen., Cheyenne, for appellee.

Before THOMAS, C.J., and BROWN, CARDINE, ROONEY (Ret.), and RAPER (Ret.), JJ.

BROWN, Justice.

Appellant Charles Murry was convicted of first degree murder by a Campbell County jury. On appeal he raises seven issues as follows:

"Whether the defendant's attorney at trail was so incompetent as to deny him the effective assistance of counsel guaranteed by the United States Constitution and the Constitution of the State of Wyoming.

"Whether there is sufficient evidence of premeditation by the defendant for the trial judge to submit to the jury the charge of first degree murder.

"Whether the evidence of premeditation was so lacking and the evidence of provocation and heat of passion so strong as to require this Court to reduce the conviction to manslaughter or, at least, second degree murder.

"Whether the trial court committed reversible error in denying defendant's motion for change of venue.

"Whether the comments of the prosecuting attorney in closing argument, in violation of the express instructions of the Court, warranted a mistrial.

"Whether the trial judge committed reversible error by permitting the prosecutor to inquire of defendant on cross examination concerning a prior felony conviction."

The state consolidated and rephrased the issues thusly:

"I

"Did the jury act properly in convicting the appellant of first-degree murder rather than manslaughter?

"II

"Did the trial judge err in refusing appellant's motion for a change in venue?

"III

"Did the prosecutor's comments during closing argument mandate reversal?

"IV

"Did the trial court err in allowing appellant to be cross-examined on his previous conviction for possession of a forged instrument?

"V

"Was appellant provided with reasonably effective counsel during this trial?"

We will affirm.

In the early evening of August 11, 1980, appellant Charles Murry and his wife Shirley went into the Watering Hole #3 Bar near Gillette, Wyoming, to await a telephone call and visit a friend, Craig Bernatchy, who was bartending. They waited about an hour, then left, returning around 8:30 p.m. They joined Floyd "Fats" Carter and others at the bar and began drinking. "Fats" apparently took a liking to the feather in appellant's hat and began to harass him about it, first asking if he could buy the feather and then saying he might just take it. As the evening wore on and the consumption of alcohol increased, the conversation focused primarily on the fact that appellant, who is black, was married to a white woman. "Fats" Carter and others joined in casting racial slurs and obscenities at appellant. Appellant did not stand mute.

About midnight, having failed to receive the expected telephone call, Murry decided to go home. As he and his wife were leaving he stopped at the end of the bar near the place where John Carter (brother of "Fats" Carter) was sitting. The two men exchanged a few words but the conversation ended when John Carter struck appellant on the nose and appellant fell to the floor. After being hit, appellant imme-

diately left the bar, followed by his wife. Appellant went to his van parked in the vicinity of the bar, obtained a shotgun, and went back to the bar where he stuck his head inside the door and said to John Carter, Come on out, cowboy, I'll take care of you (or words to that effect). Mrs. Murry then asked Craig Bernatchy to go outside and try to calm her husband down before anything serious happened. Craig Bernatchy and Leroy Hibbs went outside. Within two to three minutes Craig Bernatchy lay dead from a shot fired by appellant.

Following the shooting Leroy Hibbs approached appellant and told him he could not leave because he had just shot Craig Bernatchy. Appellant replied: "No, I didn't shoot Craig." The fatal weapon was surrendered to Leroy Hibbs who restrained Murry until the police arrived. At trial appellant testified that he did not remember firing the gun; he told the police after the shooting that Bernatchy had grabbed the gun and it had gone off accidentally.

Appellant was tried by a jury in district court on November 17 and 18, 1980, and convicted of first degree murder. He appeals the judgment and sentence dated December 5, 1980.[1]

## I

■ In the first issue appellant argues that there was insufficient evidence of premeditation and malice; that the evidence demonstrated instead that he acted because of provocation, and therefore manslaughter was the only proper verdict. The state prosecuted appellant on the theory of transferred intent. As applied to homicide, transferred intent exists when an actor intends to kill one person but kills another instead. The actor is held to the same degree of culpability as if he had killed the intended victim. "The intent is transferred

to the person whose death has been caused, or as sometimes expressed, the malice or intent follows the bullet." *Gladden v. State*, 20 Md.App. 492, 316 A.2d 319, aff'd 273 Md. 383, 330 A.2d 176 (1974); *Brown v. Commonwealth*, 223 Va. 601, 292 S.E.2d 319 (1982). See also, 40 Am.Jur.2d Homicide § 11, pp. 302–303 (1968); 21 Am.Jur.2d Criminal Law § 131, p. 265 (1981); 22 C.J.S. Criminal Law § 36, p. 124 (1961). The theory of transferred intent allows malice, premeditation, and intent to be demonstrated even though someone other than the intended victim is killed. *State v. Hamilton*, 89 N.M. 746, 557 P.2d 1095 (1976).

■ The doctrine of transferred intent is not of recent origin. *The Queen v. Saunders & Archer*, 2 Plowden 473, 75 Eng.Rep. 706 (K.B.1576). It applies to all degrees of homicide, *Henderson v. State*, 264 Ind. 334, 343 N.E.2d 776 (1976), and is applicable even though the actual death is accidental or unintentional. *State v. Hall*, W.Va., 328 S.E.2d 206 (1985). The circumstances in this case illustrate a classic example of transferred intent. Here appellant killed Craig Bernatchy when he intended to kill John Carter.

The statute in effect at the time of the offense and under which appellant was charged reads in pertinent part:

"Whoever purposely and with premeditated malice * * * kills *any* human being * * * is guilty of murder in the first degree." (Emphasis added.) § 6–4–101(a), W.S.1977.[2]

The necessary elements of the crime of murder in the first degree are:

1. The crime occurred within the county of _____ on or about the date of _____; and

---

**1.** Appellant failed to file a timely notice of appeal and the appeal was dismissed. *Murry v. State*, Wyo., 631 P.2d 26 (1981). On February 13, 1985, appellant filed a petition for a writ of certiorari in this court seeking to have his appeal reinstated based on the United States Supreme Court decision in *Evitts v. Lucey*, —— U.S.

——, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985). The petition was granted and the appeal was reinstated.

**2.** This statute has been renumbered and revised, and is now § 6–2–101, W.S.1977, (June 1983 Replacement).

2. The defendant killed a human being; and

3. The defendant acted purposely; and

4. With premeditation; and

5. With malice.

WPJIC, § 7.102.

At the time appellant was charged, second degree murder was defined in § 6–4–104, W.S.1977, as:

"Whoever purposely and maliciously, but without premeditation, kills any human being, is guilty of murder in the second degree * * *."[3]

The necessary elements of the crime of murder in the second degree are:

1. The crime occurred within the county of _____ on or about the date of _____; and

2. The defendant killed a human being; and

3. The defendant acted purposely; and

4. With malice.

WPJIC, § 7.402.

At the time appellant was charged, voluntary manslaughter was defined in § 6–4–107, W.S.1977 as:

"Whoever unlawfully kills any human being without malice, expressed or implied, * * * voluntarily, upon a sudden heat of passion, * * * is guilty of manslaughter * * *."[4]

The necessary elements of the crime of voluntary manslaughter are:

1. The crime occurred within the county of _____ on or about the date of _____; and

2. The defendant killed a human being; and

3. The defendant acted voluntarily

4. Upon a sudden heat of passion.

WPJIC, § 7.502.

The difference between first and second degree murder is that first degree murder requires proof of premeditation; second degree murder does not. The critical difference between second degree murder and voluntary manslaughter is that in second degree murder it must be proved that the accused acted purposely with malice, while in a manslaughter charge it must be proved that the accused acted voluntarily, and upon a sudden heat of passion.

Appellant contends that there was insufficient evidence of premeditation and malice and that the crime he committed was manslaughter rather than either first or second degree murder. The standard to test the sufficiency of the evidence is not unique, and we recently reiterated it in *Simmons v. State,* Wyo., 687 P.2d 255, 257 (1984):

"* * * We test the sufficiency of the evidence on appeal by examining and accepting as true the evidence of the prosecution, leaving out of consideration entirely the evidence of the defendant in conflict therewith; we give every favorable inference which may reasonably and fairly be drawn to the evidence of the prosecution. In other words, it is not whether the evidence establishes guilt beyond a reasonable doubt for us, but whether it is sufficient to form the basis for a reasonable inference of guilt beyond a reasonable doubt to be drawn by the jury when the evidence is viewed in a light most favorable to the state. [Citations.]"

Premeditation and deliberation may be inferred from the circumstances surrounding the killing. *Goodman v. State,* Wyo., 573 P.2d 400 (1977), (rev'd on other grounds). All evidence, direct and circumstantial, must be considered. It is for the jury to decide if the evidence presented establishes malice and premeditation. *Goodman v. State,* supra; and *Buckles v. State,* Wyo., 500 P.2d 518, cert. denied 409 U.S. 1026, 93 S.Ct. 475, 34 L.Ed.2d 320 (1972). "The word 'premeditated' when used in reference to first-degree murder, implies an interval, however brief, between the formation of the intent

---

**3.** This statute has been renumbered and is now § 6–2–104, W.S.1977 (June 1983 Replacement).

**4.** This statute has been renumbered and revised, and is now § 6–2–105, W.S.1977 (Cum.Supp. 1985).

or design and the commission of the act." *Collins v. State*, Wyo., 589 P.2d 1283, 1292 (1979). Premeditation need not have existed for any given length of time before the act, it being sufficient that it existed at the time of the act; and the intent and the act may be as instantaneous as successive thoughts. *Sandoval v. People*, 117 Colo. 588, 192 P.2d 423 (1948). See 22 C.J.S. Criminal Law § 29, p. 98 (1961).

Evidence which the jury was entitled to believe, tending to show premeditation and malice, is reflected in the record here. There was an altercation in the bar which resulted in appellant grabbing John Carter and in turn receiving a blow from Carter. There was testimony that Carter tried to avoid trouble with Murry. After the confrontation with Carter, appellant left the bar, followed by his wife, and got a shotgun from his vehicle. Appellant's wife stepped back into the bar and said Murry had a gun. Appellant stuck his head through the door to the bar and said, "I'm ready for you, you (expletive deleted)." At Mrs. Murry's request, Bernatchy, accompanied by Leroy Hibbs, went outside to try to pacify appellant. Appellant resisted the efforts of his wife, Hibbs and the deceased to get the gun away from him. Within the two or three minutes after appellant left the bar, Hibbs saw appellant shoot Craig Bernatchy, who was standing five or six feet away with his hands in the air.

Malice may be inferred from the use of a deadly weapon in a deadly manner, together with all the other facts and circumstances surrounding the use of a weapon. *Leitel v. State*, Wyo., 579 P.2d 421 (1978). The jury was entitled to determine that the use of the shotgun by appellant, together with the other circumstances surrounding its use, exhibited malice. Likewise, the jury was entitled to conclude that the element of premeditation was satisfied considering that appellant went from the bar to his vehicle and obtained a shotgun, and that he returned to the bar and called John Carter out of the bar. There was a minimum of two or three minutes to deliberate before appellant fired the gun.

In *Simmons v. State*, supra, at 258, we said:

"In actuality, appellant's argument goes more to the credibility of the witnesses than to the sufficiency of the evidence. He would have us believe the testimony of appellant and his witnesses over that of the witnesses presented by the State. We have consistently held that the question of credibility of witnesses rests with the trier of fact, [Citations] and this determination will not be disturbed on appeal. [Citation.] There is no rule of law that we are aware of that says that a fact finder must believe or disbelieve anyone. In fact, the trier of fact is free to accept all, part or none of the evidence offered by a witness. [Citations.]"

What we said in *Simmons* is applicable here. There was sufficient evidence of premeditation and malice to support a verdict of first degree murder.

## II

Appellant makes a perfunctory argument that his motions for a change of venue were erroneously denied. He says that most of the jurors were acquainted with either the prosecutor, some key prosecution witnesses, the deceased, or in some cases, several of them.

Were it not for the serious nature of this case we would dismiss appellant's change of venue argument because it is not supported by cogent authority or compelling argument. *Britton v. State*, Wyo., 643 P.2d 935 (1982). We know of no rule of law that mandates that a prospective juror be excused just because he knows a party, a witness or some other principal in the trial. If there were such a rule, a change of venue would be required in virtually every case in Wyoming.

As a general rule, a prosecution is to be conducted in the county where the offense is alleged to have been committed. Rule 21, Wyoming Rules of Criminal Procedure. In exceptional cases it may be necessary to grant a change of venue. Rule 23(a), W.R. Cr.P., provides:

"For prejudice in the county.—The court upon motion of the defendant made at least 15 days prior to the date set for trial, shall transfer the proceeding as to him to another county, whether or not such county is specified in the defendant's motion, *if the court is satisfied that there exists within the county where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial in that county.*" (Emphasis added.)

It is the burden of the defendant to show prejudice so great that a fair trial cannot be obtained, *Collins v. State,* supra, and the defendant must show actual prejudice in the minds of jurors. *Wilcox v. State,* Wyo., 670 P.2d 1116, 1119 (1983). Because of this, the motion for a change of venue cannot be logically passed on until the extent of prejudice, if any, is determined upon voir dire examination. *Moss v. state,* supra. " * * * The ultimate test of the propriety of a change of venue is what is revealed in voir dire of the jury panel. * * * " *Shaffer v. State,* Wyo., 640 P.2d 88, 103, 31 A.L.R.4th 166 (1982). The judge's ruling on venue is subject to review only for an abuse of discretion. *Murray v. State,* Wyo., 671 P.2d 320, 326 (1983); *Jackson v. State,* Wyo., 522 P.2d 1356, cert. denied 419 U.S. 1055, 95 S.Ct. 637, 42 L.Ed.2d 652 (1974); *Mares v. State,* Wyo., 500 P.2d 530, 535 (1972).

We have adopted a two-pronged test for determining whether a change of venue should be granted because of pretrial publicity. First, the nature and extent of the publicity must be considered; second, the difficulty or ease in selecting a jury must be considered along with the amount of prejudice which actually appears during voir dire examination. *Murray v. State,* supra. Each of these elements must be considered in order to determine whether the court abused its discretion in denying the change of venue.

It is to be expected that most of the jury panel will have heard about a sensational case, but there is no require-ment that a juror be ignorant of the facts and issues involved in a case. *Wilcox v. State,* supra. The totality of the circumstances must indicate the presence of improper prejudice. *Weddle v. State,* Wyo., 621 P.2d 231 (1980). The question focuses on whether a fair jury was ultimately selected. *Shaffer v. State,* supra. We recently reaffirmed these basic principles in *Pote v. State,* Wyo., 695 P.2d 617 (1985).

In this case a motion for change of venue was made on two occasions. On September 22, 1980, a motion was filed based upon a claim that pre-trial publicity and the lack of racial minorities in Campbell County made selection of an impartial jury impossible. That motion was denied on October 15, 1980. At that hearing no showing of pretrial publicity was made. The motion was renewed and again no attempt was made to show the extent of pretrial publicity. The motion was not renewed at trial.

The voir dire transcript does not reveal any great difficulty in selecting a jury. In fact, the defense exercised only three of its thirteen peremptory challenges. Some knowledge about the nature of the case on the part of the jury was shown but no prejudice was exhibited on voir dire. There is no evidence to justify the contention that publicity created an unfair bias. The court did not err in denying a change of venue.

### III

Before trial the court granted a motion in limine and ordered "that both counsel not use hypothetical examples of homicide or examples from the acts in another case." In summation at trial the prosecutor said:

"As to what happened in that bar that night, I'll tell you where the manslaughter would have fit if it would have happened, and that would have been if Leroy Hibbs had killed the Defendant—."

At this juncture defense counsel interrupted and requested a bench conference. The record does not reveal what transpired at the bench. However, when state's counsel continued, he said:

"Had Leroy Hibbs committed this act, then he'd probably be charged with manslaughter and he'd probably be convicted of it, but, you know, Leroy Hibbs—he was the ordinary and reasonable person in even a worse situation than this Defendant, and he never killed anybody. The Defendant did. The Defendant is guilty of murder, not manslaughter."

Appellant made no further objection nor did he move for a mistrial. After the judgment and sentence appellant made a motion for a new trial based on the statement made by state's counsel in summation. The motion was denied after the trial court found "that there was no prejudicial effect from the actions of the prosecutor."

 The denial of a motion for new trial will not be disturbed on appeal absent an abuse of discretion. *Siegert v. State,* Wyo., 634 P.2d 323 (1981). Appellant strains mightily to conclude the statement made by the prosecutor "inflamed the jury." The statement was an innocuous isolated comment which cannot logically be read as an attempt to inflame the jury. An isolated comment by a prosecutor will not ordinarily result in declaring a mistrial or granting a new trial. Appellant's unsupported conclusion that the comment was confusing and inflammatory is not supported by the record.

## IV

 Appellant's penultimate assignment of error is that the trial court erred in allowing the state to cross-examine him regarding a prior conviction of a felony. Rule 609(a), Wyoming Rules of Evidence, is applicable here:

"(a) General rule.—For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one (1) year under the law under which he was convicted, and the court determines that the probative value of admitting this evi-

dence outweighs its prejudicial effect to the defendant, or (2) involved dishonesty or false statement, regardless of the punishment."

Appellant contends that the testimony as to his prior conviction did not have any probative value and was used by the prosecutor to show that he was a "criminal-type individual."

In voir dire examination, outside the presence of the jury, appellant testified that he had been convicted of possession of a forged instrument, which was a felony. He further testified that this crime was punishable by "imprisonment in excess of one (1) year." We must determine if this testimony was probative, and if so, whether its admission into evidence was prohibited by Rule 403, W.R.E..

In his trial testimony appellant projected himself as a patient, tolerant and peaceful man who went out of his way to avoid confrontation. To rebut this evidence, the prosecutor elicited answers from appellant on cross-examination to the effect that he knew that he was not entitled to have in his possession a firearm because he was a convicted felon. We believe that the evidence produced by the state on cross-examination was probative in that it tended to show that the appellant was not the peaceful man that he presented himself to be. The evidence was, therefore, both probative and relevant.

Even if the evidence is probative and relevant it must still pass the test of Rule 403, W.R.E., which provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

A determination by the trial court that the probative value of proposed evidence was not substantially outweighed by the danger of prejudice, confusion or misleading to the jury is given considerable deference. We will not overturn the trial court's

determination on that issue unless his ruling was clearly erroneous. In *Apodaca v. State*, Wyo., 627 P.2d 1023, 1027 (1981), we said:

"When appellant claims the testimony was unduly prejudical under Rule 403, W.R.E., he must demonstrate that the evidence had little or no probative value and that it was extremely inflammatory or introduced for the purpose of inflaming the jury. * * *"

Here, evidence that appellant was a convicted felon was prejudicial in a measure. However, appellant made no showing that such evidence "had little or no probative value," nor has he shown that the evidence was "extremely inflammatory or introduced for the purpose of inflaming the jury." To the contrary, the trial court found the evidence to be probative and we agree. The trial court did not abuse its discretion in allowing evidence of a prior felony.

### V

The final issue raised on appeal is that appellant did not have effective assistance of counsel at the trial. Appellate counsel have the luxury of a trial transcript, access to a law library, and most of all, several months to reflect on what trial counsel should have done at trial. Trial counsel does not enjoy these luxuries. He has multiple problems during trial and usually only minutes, and sometimes seconds, to decide what to do. It has been said many times that "hindsight is always 20/20."

Appellant contends that his trial counsel was deficient in that he 1) mismanaged voir dire of the jury, 2) failed to produce evidence in support of a change of venue motion, 3) failed to move for a mistrial, and 4) did not offer a jury instruction on provocation. Appellant ingeniously argues some of his issues in the alternative. He contends that the evidence mandated a change of venue and if not, it was trial counsel's fault that there was not more evidence presented.

Recently in *Strickland v. Washington*, 466 U.S. 668, ——, 104 S.Ct. 2052, 2063–2064, 80 L.Ed.2d 674, 692–698 (1984), the United States Supreme Court had occasion to address the ineffectiveness of counsel problem, and wisely said:

" * * * [T]he court has recognized that 'the right to counsel is the right to the effective assistance of counsel.' * * *

" * * * The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.

\* \* \* \* \* \*

"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

\* \* \* \* \* \*

"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct,

and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' [Citation.] There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. [Citation.]

* * * * * *

" * * * [T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."

Standards regarding effectiveness of counsel, so far as we have addressed the problem, are in accord with *Strickland,* supra. In *Hoskovek v. State,* Wyo., 629 P.2d 1366, 1367 (1981), we said:

" * * * The standard which we have established to determine whether or not the assistance of counsel is effective is one of 'reasonableness.' Is the assistance rendered by counsel that which would reasonably be rendered by a reasonably competent attorney under the facts and circumstances of the case? If it is, it is effective. If it is not, it is inefffective. [Citations.] The burden rests upon appellant to establish the ineffectiveness of counsel's assistance inasmuch as there is a presumption that counsel is competent and that he performed his duty. [Citation.]"

With the standards of *Strickland* and *Hoskovek* in mind we now apply those principles to the case before us.

Appellant contends that trial counsel should have made a more in depth voir dire examination of the jury panel, especially to probe for racial prejudice. In some states voir dire examination of the jury panel lasts for weeks, even months, but in other areas voir dire is completed, even in serious criminal cases, in less than an hour. We know of no study that shows that a lengthy examination results in a more acceptable jury panel. In the case here two members of the jury panel implicity indicated that they had strong feelings about interracial marriages. We do not know what these opinions were, but assume the jurors were opposed to such marriages. These two jurors were examined by the court at the bench, but the colloquy was not recorded. One juror was excused; the other remained on the jury. We must assume that the juror who remained on the panel satisfied the court that she could be a fair and impartial juror in this case. No contention to the contrary is made.

Voir dire revealed that some members of the panel knew witnesses, the prosecutors and other principles in the case. Appellant does not contend that the jurors who knew some witnesses and the jurors who had opinions about interracial marriages should have been disqualified for cause; rather, he contends they should have been removed on peremptory challenges. Defense counsel did in fact have unused peremptory challenges.

The record reveals that the trial attorney for appellant spent about four times as much time in voir dire examination as did the state. We point this out only to demonstrate that trial counsel was not an uninterested participant as appellant implies. A probe for racial prejudice was made on voir dire without revealing anything negative except what we indicated before. Further focus on racial bias might tend to be counterproductive and emphasize a non-issue. Close questioning about a juror's acquaintance with witnesses did not reveal any prejudice and the panel said they could reach a fair verdict. Before a peremptory challenge is made there should be some rational basis to believe that a challenged juror's replacement would be more suitable. A blind challenge could just as easily result in an inferior replacement. Counsel should not exercise peremptory challenges just because he has them.

 Selecting a jury is not an exact science. The feeling a lawyer has for the case and the jury panel is a strong factor in his determination whether or not to exercise peremptory challenges. Counsel's judgment must be given considerable deference. *Strickland v. Washington,* supra. Appellate counsel and appellate courts do not have the benefit of the same trial climate enjoyed by the trial counsel. Therefore, we are reluctant to second-guess them on the exercise of peremptory challenges. We must defer to counsel's judgment unless it clearly appears that he was inept.

 In this case we cannot say that defense counsel was ineffective because he did not use all his peremptory challenges. Indeed, we would be blindly second-guessing him if we indulged in such conjecture.

Appellant faults trial counsel for not marshalling evidence that would require a change of venue. Appellant's complaint is premised on the assumption that such evidence was available. However, he does not allude to any such evidence. In his argument appellant mentions newspaper articles, but neglects to give us any hint as to the content of those articles. Appellant's entire argument is based on the assumption that out there some place was evidence to support a change of venue, and trial counsel was ineffective because he did not discover it. Appellant has failed to meet his burden to demonstrate ineffectiveness of counsel.

Appellant argues that trial counsel should have made a motion for a mistrial because of a statement made by the prosecutor in summation. We indicated in Part III that the comment was isolated, innocuous and harmless, and therefore not a basis for granting a new trial. It is highly unlikely that the judge would have granted a mistrial.

Appellant contends that trial counsel should have requested an instruction on provocation which arguably would have strengthened his argument that voluntary manslaughter was the crime committed rather than murder. The jury was in-structed on the elements of the lesser included offense of manslaughter. One of the elements of manslaughter is sudden heat of passion. In his closing argument trial counsel argued provocation at considerable length. He reasoned that provocation induced "rage" in appellant, or in the terms of the statute, "heat of passion." Appellant does not contend that anything more could have been argued in support of a manslaughter finding if a provocation instruction had been given. We believe that under the circumstances of this case a provocation instruction would have added little, if anything, to appellant's theory of defense.

Appellant cites cases from the United States Supreme Court and from the State of Wyoming. These cases discuss generally a defendant's right to the effective assistance of counsel. They also discuss standards. However, when appellant refers to specific areas in which he contends counsel was ineffective he cites no cases nor authority supporting such ineffectiveness claim.

We cannot say that appellant did not receive reasonably effective assistance from counsel, nor has it been shown that counsel's representation fell below an objective standard of reasonableness. Furthermore, appellant has failed to rebut the strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

We have carefully considered all errors urged by appellant and find no reversible error.

Affirmed.

CARDINE, Justice, dissenting.

The majority opinion of this court recognizes that the first degree murder conviction of Charles Murry cannot be upheld unless the doctrine of "transferred intent" applies. Thus, the court, in its opinion, states:

"The circumstances in this case illustrate a classic example of transferred intent.

Here appellant killed Craig Bernatchy when he intended to kill John Carter."[1]

The problem with this statement is that there is simply no evidence at all that appellant, Charles Murry, intended to kill John Carter when the gun fired. It is suggested that when he was informed that he had just shot Craig Bernatchy and replied, "No, I didn't shoot Craig," it was an admission that he thought he had shot John Carter. But appellant's testimony in context was that he did not remember shooting the gun and, therefore, did not think he had shot Craig or anyone else. Thus, Charles Murry testified:

"Q. Did you run to the van?

"A. Evidently, I did.

"Q. What happened next?

"A. The next thing I knew Leroy was telling me that I had shot Craig.

"Q. Do you remember fighting with your wife?

"A. No, I don't.

\* \* \* \* \* \*

"Q. Well, do you remember pushing your wife away onto the ground and running around the van?

"A. No, I don't. I remember running into Leroy. The next thing I remember I ran into Leroy.

"Q. Okay. Do you remember shooting that gun?

"A. No, I don't.

"Q. The next thing you remember you ran into Leroy?

"A. Yes, I did.

"Q. What happened?

"A. Well, when I ran into Leroy—Leroy was standing there. He told me I had shot Craig and I told him, no, I hadn't and he said, yes, you did and he said Craig's laying down there on the ground, and I gave Leroy the shotgun and he threw it away."

The court notes the excessive drinking by all participants which may explain appellant's lack of recall. This court, in its opinion, also notes that the police officers said that appellant, immediately after the shooting, stated that Craig Bernatchy grabbed the gun and it discharged. Neither appellant's testimony that he did not recall shooting the gun nor his alleged statement that the gun discharged when Bernatchy grabbed it is evidence that he thought he was shooting at Carter. Finally, the uncontroverted evidence establishes that Craig Bernatchy and Leroy Hibbs went outside at Mrs. Murry's request to calm down her husband. Mrs. Murry, Bernatchy, and Hibbs were outside with appellant for two or three minutes before the shooting occurred. The only fair inference from these facts is that appellant knew who was present outside the bar; surely it cannot be inferred from these facts that appellant believed John Carter was present at that time.

In a California case similar to this case, the defendant, Mrs. Steward, after premeditating and deliberating, stabbed her roommate, Mrs. Hosford. Although the knife struck home, Mrs. Hosford escaped the premises with non-fatal wounds. When the police investigated the next day, they found the defendant's daughter, Carol, stabbed to death in her bed. The court held that neither the defendant's intent nor her premeditation could be transferred from Mrs. Hosford to Carol under the doctrine of transferred intent. This was because there was no evidence that the defendant intended Mrs. Hosford as the victim when she stabbed Carol. The intent and premeditation could have been transferred, according to the court, only if "appellant had lunged at Mrs. Hosford with the knife and had stabbed Carol inadvertently when Mrs. Hosford stepped aside, \* \* \* but \* \* \* the record is barren of such evidence." The court affirmed Mrs. Steward's conviction of

---

**1.** The classic case of transferred intent involves "bad aim." For example, "where A aims at B with a murderous intent to kill, but because of a bad aim he hits and kills C, A is uniformly held guilty of the murder of C. And if A aims at B with a first-degree-murder state of mind, he commits first degree murder as to C, by the majority view." W. LaFave & A. Scott, Criminal Law, 252 (1972).

first degree murder only because there was sufficient independent evidence showing that Mrs. Steward intentionally stabbed her daughter with premeditation. *People v. Steward*, 156 Cal.App.2d 177, 318 P.2d 806 (1957).

The jury should not have been instructed on the doctrine of transferred intent. "An instruction should not be given if it is not reasonably supported by the evidence, or if it is not based on some theory logically derived from some part of the evidence." *Patterson v. State*, Wyo., 682 P.2d 1049, 1050 (1984). Without utilizing the doctrine of "transferred intent," there is simply no evidence that appellant shot and killed his friend, Craig Bernatchy, with premeditated malice. The killing may have been accidental or in a sudden heat of passion which would be manslaughter. We should, therefore, reduce or set aside appellant's conviction unless we can conclude that the jury based its verdict on evidence of premeditation unrelated to the theory of transferred intent.

## PREMEDITATION

The only other basis for finding that appellant premeditated Bernatchy's death is so poorly supported by the evidence that it cannot save this conviction. This is especially true if a correct legal definition of premeditation is applied to the facts of this case.

Premeditation is defined negatively by the court in the majority opinion as a thought process that does not involve a set period of time. The court seems to be saying that a defendant can premeditate instantaneously, in the same time that it takes him to form the intent to act. The problem with this approach is that it leads courts and juries to the conclusion that premeditation is nothing more than intent. This, in turn, blurs the distinction between first and second degree murder, a distinction the legislature has based entirely on the difference between premeditation and intent.[2]

"[T]he classical and traditional Wyoming statutory first degree murder language and its meaning [are] fairly well settled." T. Lauer, Goodbye 3–Card Monte: The Wyoming Criminal Code of 1982, 19 Land & Water L.Rev. 107, 121 (1984).

" 'It requires that there should be time and opportunity for deliberate thought, and that after the mind has conceived the thought of taking life, the thought is meditated upon and a deliberate determination formed to do the act. This being done, it makes no difference how soon afterwards the fatal resolve is carried into execution. There need be no specific period of time between the formation of the intention in the mind to kill and the killing so long as there was some time for deliberation.' " *Cloman v. State*, Wyo., 574 P.2d 410, 418 (1978), citing *State v. Riggle*, 76 Wyo. 1, 298 P.2d 349, 367 (1956).

It is clear from our statement in Cloman that the key aspect of "premeditated malice" is not the absence of time as the majority suggests, but instead the opportunity for deliberative thought.[3] Without

---

**2.** At the time appellant was charged, first degree murder was defined by § 6–4–101(a), W.S.1977 as a purposeful homicide undertaken with premeditated malice. Second degree murder was a purposeful and malicious homicide but without premeditation. Section 6–4–104, W.S.1977.

"It is often said that premeditation and deliberation require only a 'brief moment of thought' or a 'matter of seconds,' and convictions for first degree murder have frequently been affirmed where such short periods of time were involved. The better view, however, is that to 'speak of premeditation and deliberation which are instantaneous, or which take no appreciable time, * * * destroys the statutory distinction between first

and second degree murder,' and * * * this view is growing in popularity." (Footnotes omitted.) W. LaFave & A. Scott, Criminal Law, 563 (1972). See also *People v. Wolff*, 61 Cal.2d 795, 40 Cal.Rptr. 271, 394 P.2d 959, 975 (1964); *State v. Shirley*, 60 Wash.2d 277, 373 P.2d 777 (1962).

**3.** "Those who first employed [the word premeditated] in this type of first-degree murder statute undoubtedly had in mind a malicious scheme thought out well in advance of the fatal act itself. And unless we are willing to ignore the plain meaning of words we are forced to recognize that a fatal act might be intentional and yet entirely too hasty to be

this opportunity for deliberation, there can be no premeditated malice and no first degree murder.

## SUFFICIENCY OF THE EVIDENCE OF PREMEDITATION

Generally, three categories of evidence can show premeditation:

"(1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is, *planning activity;* (2) facts about the defendant's prior relationship and conduct with the victim from which *motive* may be inferred; and (3) facts about the *nature of the killing* from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design." W. LaFave & A. Scott, supra at 564.

The uncontroverted facts of this case say to me that under instructions correctly stating the law, appellant's conviction would have been for the crime of manslaughter, i.e. a killing upon a sudden heat of passion or involuntarily in the commission of some unlawful act.[4]

The uncontroverted facts follow: Appellant is a black man married to a white woman. Gillette, Wyoming is in a major area of oil drilling and production activity. Many of its residents are oil rig hands, roughnecks, drillers, tool pushers, or employed in related occupations. The evening that this incident occurred, appellant, a musician, was at the Watering Hole # 3 Bar in Gillette awaiting a telephone call and visiting his friend, Craig Bernatchy, who was bartending. "Fats" Carter noticed appellant because he was "black" and because he had a "plume" in his hat and testified:

"Q. So, what did you do when you noticed these things?

"A. Oh, I don't know—I decided I'd have his plume, I guess."

The cocktail waitress stated:

"I heard * * * John D. [Carter] calling Chuck [Murry] a f—king nigger."

Appellant's wife, Shirley Ann Murry, testified:

"They wanted the feather in his hat. He said you can't have my feather; I told you the next time I play Deadwood I'll get you one. They said you're lying. Chuck said, yes, I will.

 * * * * * *

"They said what is it with you motherf—king niggers and your white feathers and your white broads. Then, I looked up and Chuck turned around, and he said she isn't a broad; that's my wife, and he said why don't you just leave us alone.

 * * * * * *

"Q. Now, you and Chuck are leaving. What happened then?

---

deliberate and premeditated. The notion that a fully-formed intent is always deliberate and premeditated, no matter how short the time between the first thought of the matter and the execution of the plan, is preposterous. And yet some of the courts have taken just such a position. * * * In line with this suggestion it has been said that one may be guilty of murder in the first degree although the intent to commit such homicide is 'formed by the accused immediately before the act is actually committed,' or 'at the very moment the fatal shot was fired.'

"The sound interpretation of such a statute is that a killing is deliberate and premeditated if, and only if, it results from real and substantial reflection. It is not sufficient that the idea be fully formed and acted upon; it must be pondered over and weighed in the mind." R. Perkins & R. Boyce, Criminal Law, 131–132 (3rd ed. 1982).

See also W. LaFave and A. Scott, supra at 563–564; *People v. Wolff,* 61 Cal.2d 795, 40 Cal.Rptr. 271, 394 P.2d 959, 976 (1964), citing *People v. Thomas,* 25 Cal.2d 880, 156 P.2d 7 (1945) (" 'The true test is not the duration of time as much as it is the *extent of the reflection.'* " (Emphasis added.))

4. The manslaughter statute in effect at the time of this incident, § 6–4–107, W.S.1977, provided:

"Whoever unlawfully kills any human being without malice, expressed or implied, either voluntarily, upon a sudden heat of passion, or involuntarily, but in the commission of some unlawful act, except as provided in W.S. 31–5–1117, or by any culpable neglect or criminal carelessness, is guilty of manslaughter, and shall be imprisoned in the penitentiary not more than twenty (20) years."

"A. * * * Chuck stuck out his hand like he wanted to shake hands with Carter and he said, hey, man, no hard feelings; I'll still get you a feather. About that time, J.D. took a punch at him and hit him and Chuck fell and almost knocked me over * * *.

* * * * * *

"His mouth was bleeding. I handed him his glasses and he put them on. He said nobody's hitting me.

* * * * * *

"He kept saying nobody does that, nobody does that. He was looking at me but he wasn't seeing me, and I got scared."

Appellant, Charles Murry, testified:

"Q. Okay. You try to avoid confrontations along that issue [regarding his race]?

* * * * * *

"A. I learned that you accept it and just throw things off. Certain things you hear and some you don't hear, you just look over them.

* * * * * *

"Q. Do you recall anything else that happened with John Carter?

"A. Well, when I was leaving—that's after Craig [Bernatchy] and I got through talking. Craig had called me in the liquor department and I was coming out, John D. was standing in the hallway and I was coming by, and he said you get away from me, you dirty nigger, I don't like f—king niggers. I said, hey, man, I don't either and I walked on by. He just kept it up.

* * * * * *

"Q. Now, what happened?

"A. You know, when I was leaving and I was talking with Jeff LeBeau—I was talking to Jeff and Carter cut in, and I told him, hey, man, it's all over—you know, I'm leaving—you know, just like that. He said something else and I turned around and told him, man, it's over with—which I've done so many times before—and that's when he sucker-punched me.

"Q. Where did you get hit?

"A. In the nose."

The manner in which the shooting occurred does not imply premeditation. Appellant was extremely drunk and upset. He had been the subject of extreme abuse and racial slurs. His actions thereafter were irrational. According to Leroy Hibbs, the only eyewitness to the event, appellant struggled with his wife and pushed her to the ground just prior to the shooting. While I agree that premeditation is usually a jury question, in this case I do not believe the evidence, under proper instructions on the law and taken in the light most favorable to the prosecution, could establish premeditation beyond a reasonable doubt. It is quite likely that the jury improperly applied the doctrine of transferred intent to reach its decision that appellant premeditated the killing of Craig Bernatchy.

## RELIEF FOR APPELLANT

When the element of premeditation has not been proven by the State beyond a reasonable doubt, reversal of the conviction is not always required. We can sometimes reduce the conviction to second degree murder or manslaughter without a new trial. *Goodman v. State*, Wyo., 573 P.2d 400, 414 (1977). Such a remedy would not be proper in this case, however, because it is likely that the jury relied upon the doctrine of transferred intent to conclude that the shooting was intentional. Transfer of the intent element was no more justified in this case than was transfer of the premeditation element. It is impossible to tell if the jury reached its general verdict by transferring the intent to shoot Carter to intent to shoot Bernatchy. If the "transferred intent" instruction had not been given to the jury, I would propose that we reduce appellant's conviction to manslaughter. Having given this instruction, however, I am convinced that appellant's conviction should be reversed and his case remanded for a new trial so the jury can, under proper instructions of law, pass upon

the premeditation and intent issues without the smokescreen created by the transferred intent rule.