Michael Jay YOUNG, Appellant (Defendant),

v.

The STATE of Wyoming, Appellee (Defendant).

No. 91–154.

Supreme Court of Wyoming.

March 26, 1993.

Rehearing Denied April 21, 1993.

Wyoming Public Defender Program: Leonard D. Munker, State Public Defender, Dave Gosar, Asst. Public Defender, Timothy K. Newcomb, Cheyenne, and Edward P. Moriarity and Kent W. Spence, Spence, Moriarity & Schuster, Jackson, for appellant.

Joseph B. Meyer, Atty. Gen., Sylvia Lee Hackl, Deputy Atty. Gen., Barbara L. Boyer, Sr. Asst. Atty. Gen., and Mary Beth Wolff, Asst. Atty. Gen., for appellee.

Before MACY, C.J., THOMAS, CARDINE and GOLDEN, JJ., and URBIGKIT *, J., Retired.

THOMAS, Justice.

The major issue to be resolved in this case is whether the instructions on the law of Wyoming given to the jury adequately distinguish the offenses of first degree murder and second degree murder. Michael Jay Young (Young) asserts additional, collateral issues relating to the failure of the state to preserve evidence claimed to be both exculpatory and essential to his defense, together with the constitutional implications of that failure; the refusal of the trial court to instruct the jury the missing evidence could be subject to an inference or presumption it was favorable to the defendant; the admission of hearsay testimony contrary to the rules of evidence; and cumulative error. Our review of the trial record together with our study of the applicable rules of law persuade us no reversible error was committed in connection with Young's trial. The judgment and sentence is affirmed.

In his Brief of Appellant, Young states the issues in this fashion:

FEDERAL LAW ISSUES

I: Did the state fail to disclose exculpatory evidence to the defendant and thereby violate the Due Process Clause of the United States Constitution?

II: Did the loss of potentially useful evidence constitute a violation of the federal Due Process Clause?

STATE LAW ISSUES

I: Does Article 1, Sec. 36 of the Wyoming Constitution require the state to prove that a defendant has no right to require the state to preserve potentially exculpatory evidence?

II: Does the Due Process Clause of the Wyoming Constitution require the state to preserve potentially exculpatory evidence?

III: When the state fails to preserve potentially exculpatory evidence, does the Due Process Clause of the Wyoming Constitution require the defendant to prove prejudice or should the state properly have to prove the absence of prejudice?

IV: Was the Due Process Clause of the Wyoming Constitution violated when the court refused to instruct the jury that evidence lost by the state or its agent could be inferred as favorable to the defendant and unfavorable to the state?

V: Has the meaning given "premeditation" by this Court foreclosed an option

by the jury to find 2nd degree murder and thereby deprived the Defendant of his right to a jury and a fair trial?

VI: Was hearsay testimony admitted in violation of W.R.E. 403 and the state constitutional rights to confront adverse witnesses and to a fair trial?

VII: Was Mike Young denied a fair trial due to the cumulative errors that occurred during the proceeding?

The State of Wyoming, as appellee, rephrases the issues in its brief in this way:

I. Whether the state failed to disclose potentially exculpatory evidence?

II. Whether the jury was properly instructed on the elements of first and second degree murder?

III. Whether the trial court erred in allowing the admission of out of court statements of Eva Lundgren and of the victim?

Young was charged with first degree murder for the killing of Patrick J. Prime (Prime) on Wednesday, October 10, 1990. On the preceding Friday, Prime had been involved in an altercation in a bar, during which Young's mother suffered an injury to her elbow. On Saturday morning, Young received a phone call from his mother during which she informed him that Prime had hurt her. Young was upset and angered by this news. For several days thereafter, he attempted to talk to Prime, seeking an explanation or an apology.

On Monday morning, October 8, 1990, Young accompanied his mother to the Rock Springs police station to assist her in filing assault charges against Prime. After a police officer had discussed with Young's mother the options that were available to her, she elected to simply file a report of the incident and not to press charges against Prime. At that time, Young indicated to the officer who took the report that Prime needed to be controlled and, if he were not controlled, then Young would take care of things by himself, in his way. That same day, Young purchased a .38 caliber handgun, and he began working out so that he could fight Prime.

Two days, later, on Wednesday, October 10, 1990, Young telephoned Prime but, be-fore Prime could say anything to him, Young hung up the telephone. This made Prime angry, and he called Young back. They agreed to meet at the Conoco truck plaza. Both agreed to go to that meeting alone. At his wife's insistence that he not go alone, however, Prime called Kevin Ringdahl (Ringdahl) and asked Ringdahl to accompany him. Prime took his own gun with him.

After Ringdahl picked Prime up at Prime's home, they drove to the Conoco truck plaza. Ringdahl let Prime out of his truck in the parking lot, and he then maneuvered the vehicle so that he could keep an eye on Prime. Prime left his weapon in Ringdahl's truck. Young drove up, and Ringdahl watched as Prime approached Young's pickup. Young jumped out of the truck with his gun in hand and immediately fired at Prime. Prime tried to run away, but Young fired a second time, striking Prime in the neck and causing him to collapse flat on his face with his arms beneath him. At that juncture, Ringdahl grabbed Prime's gun and got out of his truck.

As Prime lay motionless on the ground, Young walked up, put his pistol to Prime's head, and pulled the trigger another time. Ringdahl did not fire the gun that he was holding. Young then jumped back into his truck and drove off. Two days later, Young surrendered at a police station in Flagstaff, Arizona.

On May 17, 1991, Young was convicted by a jury of first degree murder. Young then moved for a judgment of acquittal, reduction of the verdict and/or a new trial, and filed a memorandum in support thereof on May 24, 1991. Young's motion seeking the alternative and relief was denied and, also on May 24, 1991, the judgment and sentence was entered. Young was sentenced to confinement in the Wyoming state penitentiary for life. Young appeals from the judgment and sentence and the order denying his motion for judgment of acquittal, reduction of sentence and/or new trial.

We perceive the major issue in this case to be whether the law of this state, as

given to the jury in the instructions of the court, serves to adequately distinguish the offenses of first degree murder and second degree murder. First degree murder is defined in Wyo.Stat. § 6–2–101 (Supp.1992) which, for the purposes of this case, provides:

> (a) Whoever purposely and with premeditated malice, * * * kills any human being is guilty of murder in the first degree.
> (b) A person convicted of murder in the first degree shall be punished by death or life imprisonment according to law * * *.

The offense of second degree murder is defined in Wyo.Stat. § 6–2–104 (1988) as follows:

> Whoever purposely and maliciously, but without premeditation, kills any human being is guilty of murder in the second degree, and shall be imprisoned in the penitentiary for any term not less than twenty (20) years, or during life.

The jury was instructed with respect to both of these offenses and was advised that second degree murder is a lesser included offense of first degree murder. The jury was given the following instructions:

### JURY INSTRUCTION NO. 11

The necessary elements of the crime of murder in the first degree are:
1. The crime occurred within the county of Sweetwater on or about the date of October 10, 1990; and
2. The defendant killed a human being; and
3. The defendant acted purposely; and
4. With premeditation; and
5. With malice.

### JURY INSTRUCTION NO. 16

The necessary elements of the crime of murder in the second degree are:
1. The crime occurred within the county of Sweetwater on or about the date of October 10, 1990; and
2. The defendant killed a human being; and
3. The defendant acted purposely; and
4. With malice.

### JURY INSTRUCTION NO. 12

"Purposely" means that the act was done intentionally or deliberately, and not accidentally.

### JURY INSTRUCTION NO. 13

"Premeditation" and "premeditated" mean that the idea of killing was thought about and considered before it was executed. It requires that there should be time and opportunity for deliberate thought and that, after the mind has thought of taking life, the thought is considered and a deliberate intention formed to kill. That being done, it makes no difference how soon afterwards the thought is carried into action, so long as there was some time for, and there was, deliberation. **The question you must answer is, not how long one should premeditate and deliberate, but whether there was premeditation and deliberation at all.** (Emphasis added.)

These instructions apparently were modeled after the Wyoming Pattern Jury Instructions. *See* WPJIC §§ 7.102, 7.104, 7.105, 7.402. The instructions did explicitly advise the jury that the difference between first degree murder and second degree murder is the element of premeditation. Young contends Instructions 12 and 13 blur the distinction between first degree murder and second degree murder because "purposely" is in the elements instruction for both first and second degree murder. He then points to the definition of the word "purposely," where the court used the word "deliberately," while, in defining "premeditation," it invoked the concept of "deliberate thought," "deliberate intention," and "deliberation."

Young's argument is that Instruction No. 12 advised the jury deliberation implies the second degree murder element of "purposely," and Instruction No. 13 advised the jury deliberation implies the first degree murder element of premeditation. Young contends this blurs the separate definitions of first and second degree murder, but we do not agree that any blurring of the defi-

nition has the effect of permitting the State to avoid proof of all elements of first degree murder beyond a reasonable doubt. The instructions are clear that the State must prove the element of premeditation. The word "deliberate" or the word "deliberation," or any form of that word, is not found in the statutory language defining either first degree murder or second degree murder. It is not used in either of the Jury Instructions 11 or 16 that list the elements of the crimes of first degree murder and second degree murder in numerical fashion. The word "deliberately" is first used in the definition of the word "purposely" and, in defining "premeditation," the words "deliberate" and "deliberation" appear.

The State concedes that, in order to commit either crime, the accused must act purposely, which was defined as "intentionally or deliberately, and not accidentally." The State contends, however, that, for the jury to find premeditation, it is required to find that "there was some time for, and there was, deliberation." The State argues the key difference between these two offenses is that the jury must find, for first degree murder, there was time for, and there was, deliberation, defined in BLACK'S LAW DICTIONARY 427 (6th ed. 1990) as, "[t]he act or process of deliberating. The act of weighing and examining the reasons for and against a contemplated act or course of conduct or a choice of acts or means." The State's argument then is that the word "deliberation" is a noun which is derived from the verb "deliberate" and, as it is used in the jury instructions, it describes a process inherent in premeditation. The word "deliberately," on the other hand, is an adjective form of the word "deliberate" and, as it is used in the jury instructions, it simply provides an alternative description of the act defined as being done purposely. As applied by the jury, a finding that Young acted intentionally or deliberately would establish the element of the crime of second degree murder, but a finding of premeditation would include the process of deliberation and would lead to the conclu-

sion that the crime of first degree murder had been established.

■ We perceive this argument to be more semantic than substantive. The State, however, in its brief, concedes the matter is not without difficulty, stating:

> While it is clear that the law has drawn a very fine distinction that the English language is barely capable of expressing, it is equally clear that the jury instructions taken "as a whole and in the context of the entire trial fairly and adequately cover[ed] the issues."

Appellee's Brief at 29 (citing *Scadden v. State*, 732 P.2d 1036, 1053 (Wyo.1987)). These instructions do clearly demonstrate that the difference between first degree murder and second degree murder is the element of premeditation and, to commit first degree murder, the defendant must have **killed** purposely while, to commit second degree murder, the defendant is only required to have **acted** purposely.

■ We have conceded the distinction between first degree murder and second degree murder may have become somewhat blurred in our cases over the years. In a recent effort to sort out any confusion in this area of the law in connection with the sufficiency of the evidence, Justice Golden wrote in *Bouwkamp v. State*, 833 P.2d 486, 493 (Wyo.1992):

> We are somewhat troubled with the evidence of premeditation offered by the state. It is apparent that the hedgerow separating the offenses of first and second degree murder has fallen into some disrepair, requiring that we do some pruning to restore the boundary.

As the *Bouwkamp* opinion points out, the differences in the offenses of first degree murder and second degree murder are the element of premeditation and the nature of the criminal intent. First degree murder is a specific intent crime, requiring proof the defendant killed purposely and with premeditation, while second degree murder is a crime of general intent, requiring proof only of acting purposely or voluntarily. The court's decision in *Bouwkamp* and the analysis found there with respect to these homicide offenses are persuasive and probably control in this case, but we extend

that analysis to address the facts presented here.

As early as 1899, this court adopted the following reasoning from the Supreme Court of Indiana:

The principle involved by which murder in the first degree is distinguished from murder in the second degree, is this: In the former, premeditated malice requires that there should be time and opportunity for deliberate thought, and that, after the mind conceives the thought of taking the life, the conception is meditated upon, and a deliberate determination formed to do the act. That being done, then, no difference how soon afterwards the fatal resolve is carried into execution, it is murder in the first degree,—while in murder in the second degree the purpose or intention to kill is followed immediately by the act; it is not premeditated; the time and circumstances are not such as to allow of deliberate thought; yet, to make it murder, even in the second degree, there must be a formed design and purpose to kill.

*Ross v. State*, 8 Wyo. 351, 387, 57 P. 924, 932–33 (1899).

In a later homicide case, this court held it to be error to instruct the jury no particular time need intervene between the formation of the intention and the act in order to constitute premeditated malice. *Parker v. State*, 24 Wyo. 491, 161 P. 552 (1916). The court ruled such an instruction would, in effect, tell the jury it would suffice to constitute murder in the first degree under our statute if the jury found from the evidence that the intention to kill was present in the mind of the defendant at the time the act was committed. We held this would be an erroneous conclusion because it is premeditation, that is, deliberating upon the killing, which raises the crime of homicide to first degree murder.

■ Some forty years later, we approved a jury instruction that defined premeditated malice in a fashion nearly identical to Jury Instruction No. 13 of which Young complains in this case. In *State v. Riggle*, 76 Wyo. 1, 298 P.2d 349, *reh'g denied*, 76 Wyo. 1, 300 P.2d 567 (1956), *cert. denied*, 352 U.S. 981, 77 S.Ct. 384, 1 L.Ed.2d 366 (1957), the court emphasized the defendant needs to have time to make a plan in first degree murder, as distinguished from second degree murder. The instruction in that case read, "[t]here need be no specific period of time between the formation of the intention in the mind to kill and the killing so long as there was some time for deliberation." *Riggle*, 298 P.2d at 367. *Riggle* was cited in *Collins v. State*, 589 P.2d 1283 (Wyo.1979); *Cloman v. State*, 574 P.2d 410 (Wyo.1978); *Goodman v. State*, 573 P.2d 400 (Wyo.1977), *appeal after remand*, 601 P.2d 178 (Wyo.1979); and *Buckles v. State*, 500 P.2d 518 (Wyo.1972), *cert. denied*, 409 U.S. 1026, 93 S.Ct. 475, 34 L.Ed.2d 320 (1972). The following quotation from *Cloman* is revealing:

1 Wharton's Criminal Law and Procedure by Anderson p. 563, et seq., states the rules of law on premeditation as follows:

Deliberation and premeditation involve a prior intention or design to do the act in question. It is not necessary, however, that this intention should have been conceived at any particular period of time, and it is sufficient that only a moment elapsed between the plan and its execution, as long as the jury can conclude that there was some appreciable interval however small. It is sufficient that with the intention to commit the act the appreciation of the result likely to follow appeared to the defendant at the time the act was committed, or that he understood and contemplated the consequences of his act. A killing may be the result of prompt and speedy execution of a hasty or immediate resolution and yet have been done with express malice. When a design is once formed, the haste with which it is put into execution in no way affects or modifies the degree of guilt incurred. Such design may have existed for only an instant before the commission of the crime. [footnotes omitted]

Whether premeditation is present in a given case is a question of fact to be determined by the jury from all the circumstances of the case, such as the use

of a deadly weapon upon an unarmed victim; * * * (footnotes omitted)

*Cloman,* 574 P.2d at 418.

Whether the element of premeditation has been established by the evidence under the facts and circumstances of each case is a question for the jury to determine.

Moving ahead some thirty years past *Riggle,* this court reiterated that it is for the jury to decide whether the evidence presented establishes the elements of premeditation and malice. *Murry v. State,* 713 P.2d 202 (Wyo.1986). The jury is entitled to consider both the direct and circumstantial evidence presented, and we made it clear premeditation and deliberation can be inferred from the circumstances surrounding the homicide. We again, pointed out the distinction between first degree murder and second degree murder, saying:

> The difference between first and second degree murder is that first degree murder requires proof of premeditation; second degree murder does not.
>
> \* \* \* \* \* \*
>
> The word "premeditated" when used in reference to first-degree murder, implies an interval, however brief, between the formation of the intent or design and the commission of the act.

*Murry,* 713 P.2d at 206–07 (citing *Collins*).

In *Murry,* we discussed again the interval of time necessary for the jury to find the existence of premeditation. We said:

> Premeditation need not have existed for any given length of time before the act, it being sufficient that it existed at the time of the act; and the intent and the act may be as instantaneous as successive thoughts. *Sandoval v. People,* 117 Colo. 588, 192 P.2d 423 (1948).

*Murry,* 713 P.2d at 207.

We emphasize that the expression requires the thoughts to be successive, not simultaneous. This connotes a separation in time is necessary, no matter how brief it might be, for the mind to form the thought of killing, consider that thought, and form the deliberate intention to kill.

In 1986, we also decided *Crozier v. State,* 723 P.2d 42 (Wyo.1986). *Crozier* offers guidance with respect to the definition of the word "purposely." "Purposely" is found in both the first degree murder statute and the second degree murder statute. As "purposely" is used in defining the offense of second degree murder, the word describes the act to be committed and not an intention to produce the desired, specific result. *Crozier.* We again emphasize that the jury instructions given at Young's trial set forth, as one of the elements of the crime of first degree murder, that "the defendant **killed** purposely." Jury Instruction No. 11 (emphasis added). That must be compared to the instruction defining the crime of second degree murder, which sets forth as one of the elements of that crime, that "the defendant **acted** purposely." Jury Instruction No. 16 (emphasis added). That distinction may well be the most meaningful of all. A requirement that the jury find the defendant killed purposely and with premeditation and with malice is indeed different from the requirement that the defendant acted purposely and with malice. In *Crozier,* the distinction between first degree murder and second degree murder is identified as the difference in intent. The element distinguishing first degree murder from second degree murder is the specific intent to kill, which is the premeditated killing. *Crozier.*

■ While Young's argument suggests it might be appropriate to eliminate the use of the word "deliberately" in defining "purposely," there is nothing in this record to indicate that the jurors were confused in any way. They did not question the elements of either crime, nor were they confused by the jury instructions given to them. Young raises the question for the first time in his appeal. Young did not object at trial to the jury instructions which are attacked in this appeal. The record discloses that counsel said, "10 through 14 on first degree murder, the only objection we have is there is an overwhelming number and becomes an argument to the jury. * * * Yes, Your Honor, 15 and 16 are second degree. There is no objection there." In the absence of an objection at

trial, the plain error rule would pertain, and we cannot say that plain error is presented in this instance.

In *Ramos v. State*, 806 P.2d 822, 830 (Wyo.1991) (citing *Crozier*), we said:

> Because second-degree murder is a general intent crime, a conviction for second-degree murder must be supported by evidence that the defendant acted with deliberation, but it does not require evidence that he deliberately killed.

To illustrate the difference, the statement from *Ramos* could have substituted "purposely" for the phrase "with deliberation." The real difference between first degree murder and second degree murder must be that the accused must have formed a decision to kill the victim to be guilty of first degree murder. For the defendant to be guilty of second degree murder, he must only have acted purposely with the consequence of his purposeful action being the death of the victim. Whether we draw the distinction between the two crimes on the theory of general, versus specific, intent crimes or the required element of premeditation in order to sustain a conviction of first degree murder, the distinction is present.

If that distinction has become blurred, it has to be in the context of the opportunity required for the requisite premeditation in order to elevate the charge to first degree murder. We stated in *Bouwkamp*, 833 P.2d at 494, that, "having said an instant is sufficient, we have inadvertently eliminated any principled distinction between the evidentiary requirements for the two degrees of homicide." While it may be true no measured period of time is required in order to demonstrate premeditation, the evidence must demonstrate some cool calculation involving a decision to take a life beyond the mere opportunity to deliberate. *Bouwkamp*. Although the human mind may deliberate very quickly, as quickly as "successive thoughts," premeditation must be demonstrated. It is the fact of premeditation and not any measured time that distinguishes these two offenses.

We are not persuaded by Young's argument in this case. The altercation in the bar between Young's mother and Prime occurred on October 5, 1990. Young learned about it the next day. Prime was killed on October 10, 1990. In the course of the intervening four days, Young attempted to talk with Prime in order to receive an apology or an explanation; he went with his mother to the police station to assist her in filing assault charges against Prime; he purchased a firearm and began working out to get in shape to fight Prime; and, finally, Young telephoned Prime and agreed to meet him at the Conoco truck plaza where the shooting occurred. On this evidence, the jury returned a verdict that assumes a finding Young had sufficient opportunity to deliberate and, in fact, did premeditate before killing Prime. Thus, the conviction was for first degree murder.

■ Certainly, the evidence in this case demonstrates a factual basis sufficient to justify the conviction of first degree murder. This court has reiterated on many occasions the standard for evidentiary review in a criminal case and repeated it is the jury that must be persuaded. In *Murry*, 713 P.2d 202, 206, a homicide case, we quoted the standard of review with respect to the sufficiency of the evidence to sustain a conviction from *Simmons v. State*, 687 P.2d 255, 257 (Wyo.1984), where it was stated in this way:

> We test the sufficiency of the evidence on appeal by examining and accepting as true the evidence of the prosecution, leaving out of consideration entirely the evidence of the defendant in conflict therewith; we give every favorable inference which may reasonably and fairly be drawn to the evidence of the prosecution. In other words, it is not whether the evidence establishes guilt beyond a reasonable doubt for us, but whether it is sufficient to form the basis for a reasonable inference of guilt beyond a reasonable doubt to be drawn by the jury when the evidence is viewed in a light most favorable to the state.

We do not substitute our judgment for that of the jury in applying this rule, and our duty as the appellate court is simply to

determine if a quorum of reasonable and rational individuals would have come to the same result as the jury did. *Saldana v. State*, 846 P.2d 604 (Wyo.1993) (citing *Munson v. State*, 770 P.2d 1093 (Wyo. 1989); *Corson v. State*, 766 P.2d 1155 (Wyo.1988); *Wells v. State*, 613 P.2d 201 (Wyo.1980)). After considering this record in the light of this standard, there is no question that there was ample evidence to justify the conviction by the jury of the crime of first degree murder and to support our decision that Young's judgment and sentence be affirmed.

Young raises other issues relating to the failure of the State to preserve evidence claimed to be exculpatory and the contention that constitutional implications arise from that failure. He also asserts as error the refusal of the trial court to instruct that the missing evidence is subject to an inference or presumption that would be favorable to the defendant. In addition, he complains of the erroneous admission of hearsay testimony contrary to the Rules of Evidence, and argues cumulative error. We address these additional issues in order.

In six separate statements of issues that merge together, Young claims the State violated its duty to disclose exculpatory evidence to him and, thus, he was deprived of the due process of law guaranteed by the Fifth and Fourteenth Amendments to the Constitution of the United States and Article 1, § 6 of the Constitution of the State of Wyoming. The evidence Young alleges to have been subject to disclosure, but was not disclosed, includes a list of twelve witnesses gathered by a highway patrolman at the scene, which was later lost by a deputy sheriff, and the existence of two witnesses, the "unidentified man," and Donna Redden. The State disclosed the existence of these two witnesses midway through the trial, and Donna Redden testified at the trial. Young's complaint is that these witnesses should have been disclosed prior to trial, and the failure to furnish him with the list of witnesses and the existence of the other two witnesses is a violation of the principles articulated in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

■ We adopted the *Brady* rule in *Jones v. State*, 568 P.2d 837, 847 (Wyo.1977), where we said:

> The heart of the holding in Brady is the prosecution's suppression of evidence, in the face of a defense production request, where the evidence is favorable to the accused and is material either to guilt or to punishment. Important, then, are (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence. * * * [*Moore v. Illinois*,] 408 U.S. [786] at 794–795, 92 S.Ct. [2562] at 2568, 33 L.Ed.2d [706] at 713 [1972].

The *Brady* rule requires a finding of materiality before disclosure becomes a duty of the State. In *Brady*, the defendant had made a pre-trial request for specific evidence. The Supreme Court of the United States said the requirement for materiality is rationalized by the concern the suppressed evidence might have affected the outcome of the trial. *Jones.*

■ With respect to the duty of the State to preserve evidence, in *Pote v. State*, 695 P.2d 617 (Wyo.1985) (citing *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)), we relied upon another case from the United States Supreme Court that addressed this claim. In *Pote*, 695 P.2d at 625, we articulated the rule in this fashion:

> Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, see *United States v. Agurs*, 427 U.S. [97] at 109–110, 49 L.Ed.2d 342, 96 S.Ct. 2392 [at 2400–2401 (1976)] evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and also be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means * * *.

In *Gale v. State,* 792 P.2d 570, 587–88 (Wyo.1990), we addressed similar contentions in this way:

This issue involves Gale's assertion that the initial police interviews with the victims must have contained information that would potentially aid him in his defense. Gale does not argue that he was denied access to the interviewer's notes or that the trial court denied him the right to cross-examine any of the state's witnesses whose testimony could be traced to the initial victim interviews; he also foregoes any suggestion that the police or the state acted in bad faith concerning the content of the interviews. Instead, Gale argues that the lack of such recordings somehow deprived him of his best opportunity to judge what the victim's precise allegations and explanations for their allegations were when they were first uttered. Gale says this deprivation violates the holding in *Trombetta,* which he asserts stands for the legal proposition that the police have an affirmative constitutional duty to gather and preserve evidence, as well as the recognized duty to disclose exculpatory evidence. *See Brady,* 373 U.S. at 87, 83 S.Ct. at 1196–97, 10 L.Ed.2d at 218.

We disagree with Gale's interpretation of the law on this issue. This court held that the state does not have a constitutional duty to manufacture evidence in addition to its duty under *Brady* to disclose exculpatory evidence in its possession. We also specifically held that a deputy's apparent negligence in not properly tape recording a conversation between the defendant and the deputy did not violate the defendant's rights to due process of law. *Wilde,* 706 P.2d at 255 (citing *Trombetta,* 467 U.S. at 488–91, 104 S.Ct. at 2529–30, 81 L.Ed.2d at 421–24). Here, the trial court's ruling paralleled our conclusions in *Wilde.*

Gale's assertion would expose the state to the risk of automatic dismissal for failure to tape record every initial interview it conducts with a minor victim alleging sexual assault. The state has a duty to preserve evidence only if the disputed evidence is shown to have been constitutionally material because it possessed known exculpatory value and if the defendant could not obtain comparable evidence using other reasonable means. *Wilde,* 706 P.2d at 255 (citing *Trombetta,* 467 U.S. at 479–80, 104 S.Ct. at 2529, 81 L.Ed.2d at 416–17). *Wilde* and *Trombetta* plainly limit the state's duties to preserve and disclose evidence to those duties explained in *Brady.*

We also note the United States Supreme Court's recent opinion in *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). In *Youngblood,* the defendant was charged with kidnapping and sexually assaulting a minor. When the victim reported the crime, a physician used a "sexual assault kit" to take samples from the victim that might later be used as evidence at trial. The police took these samples and the victim's clothing, but they did not refrigerate the clothing. Later, when the state criminologist tried to compare samples from the kit with stains he found on the clothing, the failure to refrigerate the clothing made the comparison impossible. Evidence from such a comparison could have exonerated the defendant who was convicted. The state appellate court reversed the conviction focusing on the potential which the lost evidence had for exoneration and the Court granted the state's petition for certiorari. In its opinion, the Court discussed the constitutional standards for the obligation the police have to preserve evidence and then held that "unless a criminal defendant can show bad faith on the part of the police, [negligent] failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Youngblood,* 488 U.S. at [58], 109 S.Ct. at 337, 102 L.Ed.2d at 289.

In *Miller v. State,* 830 P.2d 419, 426 (Wyo.1992), the following statement is found:

Likewise, the prosecution has no mandatory obligation to produce *all* witnesses conjecturally available to provide relevant testimony. *See Wilde v. State,* 706 P.2d 251, 255 (Wyo.1985). The prosecu-

tion has no defined duty to try the case for the defendant, and consequently it is not an assumed responsibility to provide the defendant's evidence. The *Brady* obligation stops with hiding and non-disclosure of evidence and does not extend to affirmative compilation and production. *Wilde*, 706 P.2d at 255.

Young's demand for disclosure of evidence must be examined in light of these cases and must be evaluated in context of the specificity of his requests.

On February 1, 1991, Young presented a request for a bill of particulars that demanded a description of each and every item which would be presented at pre-trial or at trial, requested the names of all prosecuting witnesses and the substance of their testimony, and requested any other exculpatory evidence. Young also filed a memorandum of law in support of his motion for a bill of particulars, a motion to disclose all exculpatory evidence or *"Brady"* material, and a motion for discovery and inspection of documents. On March 6, 1991, the State filed a motion for reciprocal discovery, and a hearing then was held. Two days later, the court entered an order of discovery including any and all exculpatory or *"Brady"* material, and it also entered an order denying the motion for a bill of particulars. The State filed a motion to compel discovery on April 19, 1991 and, on April 24, 1991, a telephonic hearing was held with respect to the State's motion.

■ Each of the claimed undisclosed items of evidence must be evaluated for materiality under *Brady*. Young first claims a deputy sheriff lost a list of twelve other witnesses gathered at the scene by a highway patrol officer. The record does not indicate the list actually contained twelve **other witnesses.** During the re-cross examination of the deputy sheriff at trial, the testimony was extremely vague regarding the number of names on the list, whose names were on the list, what happened to the list, or where the list might be located. The record does indicate an officer was inside the restaurant at the Conoco truck plaza taking names and addresses of people who were present and, later, anoth-

er deputy sheriff went into the restaurant and taped statements from several witnesses. On the tape recording, the deputy had each of the witnesses identify herself or himself by name, except for the "unidentified man." That name apparently is missing because the deputy commenced the interview before the tape actually started recording the dialogue. We cannot be certain of the materiality of the missing information, although we acknowledge a possibility that, if it had been available, it would be subject to disclosure. The record does not demonstrate, however, that the exculpatory value was apparent before the evidence was lost or that Young was unable to obtain comparable evidence by any other measurably available means. There is nothing whatever to evidence any bad faith on the part of the investigating officers. We are satisfied the failure of the State to make this evidence available for Young did not violate his right to due process of law and would not have led to any different conclusion at the trial.

■ We also hold the late disclosure of the waitress, Donna Redden, did not infringe Young's constitutional right to due process. The record is not clear with respect to why she was not questioned on the night of Prime's death, nor why her identity was not revealed until mid-trial. The record does reflect, however, that the State located her, and she did testify at the trial. Furthermore, there is nothing to indicate why Young could not have learned of the identity of employees who were on duty at the Conoco truck stop on the night of the killing. Since the jury did have Donna Redden's testimony to evaluate, we cannot conclude that the late disclosure resulted in a prejudice to Young.

■ In a related assignment of error, Young contends that the district court should have given the following instruction:

If you find that evidence is lost by the state or its agents, the jury may infer that the witnesses and the evidence would have been favorable to the defendant and unfavorable to the state.

Young's argument is that the court committed an abuse of discretion constituting an error of law in refusing to give this instruction and that refusal affected his right to present his defense and prevented the jury from appropriately exercising its fact-finding function. The trial court explained its refusal to give the instruction by saying that the instruction would encourage speculation. The court agreed with the prosecution that not everyone whose name might have been on the list would necessarily have been called to testify and to instruct the jury to speculate as to what people on the missing list would have testified about would be contrary to law. The jury was aware the list had been lost through cross-examination of witnesses by Young's attorney and also the closing arguments. The court concluded that, since this information was all before the jury, they would resolve it in their own fashion without an instruction.

The refusal to give a requested instruction is reviewed under the standard of abuse of discretion. That standard was stated in this way in *Brown v. State*, 817 P.2d 429, 438 (Wyo.1991) (citing *Scadden v. State*, 732 P.2d 1036, 1053 (Wyo.1987)):

> The general rule in reviewing questions involving instructions is that the trial judge is afforded latitude to tailor the instructions to the facts of the case, and reversible error will not be found as long as the instructions when viewed as a whole and in the context of the entire trial fairly and adequately cover the issues.

We agree with the trial court that the jury instruction offered called for conjecture by the jury. The instructions the court gave fairly and adequately covered the issues in this case. We hold there was no abuse of discretion by the district court in refusing to give the proffered jury instruction.

Young's next issue encompasses his claim that he was unfairly prejudiced by the admission of out-of-court statements by Young's mother made at the bar after the altercation involving Prime and herself, and Mrs. Prime's testimony about the statements made by Prime in a telephone conversation with Young. A motion in li-

mine was filed prior to trial to preclude the statements by Young's mother from being admitted into evidence. During trial a memorandum was submitted objecting to the testimony of Mrs. Prime. In both instances, Young asserted the material constituted hearsay and did not come within any of the exceptions to the hearsay rule. Young argued the statements were not relevant under Wyo.R.Evid. 402, and the prejudicial effect outweighed the probative value under Wyo.R.Evid. 403.

The court noted the statements fit under several exceptions to the hearsay rule, denied Young's motion in limine, and overruled the objection in the later memorandum. The trial court ruled the statements of Young's mother fell within the excited utterance exception to the hearsay rule, and the testimony by Mrs. Prime was within the Wyo.R.Evid. 803(1) (present sense impression) and 803(3) (then-existing mental, emotional, or physical condition) exceptions to the hearsay rule. The excited utterance exception, found in Wyo.R.Evid. 803(2), is stated in this way:

> *Excited utterance.*—A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition * * *.

The present sense impression, found in Wyo.R.Evid. 803(1), reads:

> *Present sense impression.*—A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter * * *.

The exception for a then-existing mental, emotional, or physical condition, found in Wyo.R.Evid. 803(3), reads:

> *Then-existing mental, emotional, or physical condition.*—A statement of the declarant's then-existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execu-

tion, revocation, identification, or terms of declarant's will * * *.

 The court explained its view that the testimony of Young's mother was relevant because it involved an incident that commenced the whole chain of events, culminating in the killing of Prime at the Conoco truck plaza several days later. Furthermore, the statements were made after Young's mother was thrown to the floor by Prime, which did qualify the statements as excited utterances. With respect to Mrs. Prime's testimony, the court explained the statements did go to the state of mind of Prime and, thus, were admissible under the cited exceptions. The court did not allow any testimony by Mrs. Prime of what Prime reported Young had said. Her testimony was limited to what she heard Prime say in the telephone conversation with Young. Counsel did have the opportunity to cross-examine, and did cross-examine, Mrs. Prime at trial.

Our rule is definite that "an evidentiary ruling is within the sound discretion of the trial court, and we will not find error unless the court abused its discretion." *Gentry v. State*, 806 P.2d 1269, 1271 (Wyo. 1991) (citing *Velos v. State*, 752 P.2d 411, 414 (Wyo.1988)). We conclude there was no abuse of discretion by the district court in the admission of the statements by Young's mother. Turning to Young's claim that the admission of Mrs. Prime's testimony relating to the statements of Prime over the telephone violated the rules of hearsay and were more prejudicial than probative, we also find no abuse of discretion.

 Young asserts, in addition, with respect to Mrs. Prime's testimony, that his right to confront adverse witnesses was violated. The substance of the testimony of Mrs. Prime that Young attacks related to part of a telephone conversation she overheard between Prime and Young. Mrs. Prime was present when these statements were made. In light of the ruling by the trial court, the limitation attached to the scope of Mrs. Prime's testimony, and her availability for cross-examination, we

conclude this ruling did not violate Young's constitutional right to confront witnesses.

 Young also asserts as an issue the concept of cumulative error. We recently said, "[a] claim of cumulative error cannot be recognized where there is no underlying error to support it." *Jennings v. State*, 806 P.2d 1299, 1306 (Wyo.1991) (citing *Justice v. State*, 775 P.2d 1002 (Wyo.1989)). This proposition is applicable in this case. Young has raised a number of specific issues on appeal, and we have held there was no error with respect to any of those claims. The doctrine of cumulative error need not be considered or applied.

We have found no reversible error in our review of the record in this case in light of the applicable rules of law. The judgment and sentence is affirmed.

CARDINE, Justice, dissenting.

This is a case in which appellant was convicted of first degree murder because the difference between first and second degree murder was so blurred by the law given the jury as to become indistinguishable. The confusion resulted from the use of the defining word "deliberate" in defining premeditation.

Wyoming's first degree murder statute, W.S. 6–2–101, provides that whoever

(a) purposely

(b) with premeditated

(c) malice

kills any human being is guilty of murder in the first degree.

Wyoming's second degree murder statute, W.S. 6–2–104, provides that whoever

(a) purposely

(b) without premeditation

(c) maliciously

kills any human being is guilty of murder in the second degree.

The jury in this case was instructed, as a matter of law, that "deliberate" is both to *premeditate* and to act with *purpose.* And of course, "deliberate" can mean to premeditate *and* act with purpose. The same word, spelled the same way, can have two different meanings. It is confusing, and that becomes of enormous significance in

this case because the only difference between first and second degree murder is premeditation. If the jury could believe from the court's instructions on the law that premeditation and purposeful are the same because they are defined as "deliberate," then there is no difference between first and second degree murder.

In *Murry v. State*, 713 P.2d 202 (Wyo. 1986), the blurring of the difference between first and second degree murder was discussed in the context of improperly permitting a jury instruction, stating that premeditation required no period of time for thought but could be instantaneous. Thus, it was said,

> This, in turn, blurs the distinction between first and second degree murder, a distinction the legislature has based entirely on the difference between premeditation and intent.

> "[T]he classical and traditional Wyoming statutory first degree murder language and its meaning [are] fairly well settled." T. Lauer, Goodbye 3–Card Monte: The Wyoming Criminal Code of 1982, 19 Land & Water L.Rev. 107, 121 (1984).

> " 'It requires that there should be time and opportunity for deliberate thought, and that after the mind has conceived the thought of taking life, the thought is meditated upon and a deliberate determination formed to do the act. This being done, it makes no difference how soon afterwards the fatal resolve is carried into execution. There need be no specific period of time between the formation of the intention in the mind to kill and the killing so long as there was some time for deliberation.' " *Cloman v. State*, Wyo., 574 P.2d 410, 419 (1978), *citing State v. Riggle*, 76 Wyo. 1, 298 P.2d 349, 367 (1956).

*Murry*, 713 P.2d at 214 (Cardine, J., dissenting) (footnote omitted). The need for some time for premeditation before acting was thereafter reviewed again in *Bouwkamp v. State*, 833 P.2d 486 (Wyo.1992), and the court's discussion in that case is recommended in framing future jury instructions.

Back to the case at hand. There is no longer a reason to continue using the word "deliberate" to define premeditation. Some words are so well understood by all that definition is not required. I believe that premeditation is one of those words; but if further definition is necessary, the words "thought about beforehand" as further defining premeditation are suggested.

Nothing is more important in a civilized society than that we effectively communicate with each other. Ordinarily we communicate with words, tone of voice, gestures, and body language. Appellate court judges communicate in writing only, with words. As appellate court judges, our life is about "words." We continually search for the right word, for upon that word may rest life or death for one of our fellow citizens. We strive always for simplicity, brevity, for the correct word, and forever to avoid confusion. In this case, the jury was advised that to deliberate is to premeditate, and to be deliberate is to be purposeful. Appellant was convicted of first degree murder. The use of deliberate as a defining word is confusing and unnecessary. It should be avoided in the future.

Appellant was given a life sentence. In our state, life is life. Unless there is a commutation by the Governor, he will be in prison for all of his life. Perhaps he should be there for life. Perhaps not. In this case we can never know whether, under proper instructions, the conviction might have been second degree murder which carries a sentence of 20 years to life in prison.

For the reasons stated, I would reduce this conviction to second degree murder and, absent that, would reverse.

URBIGKIT, Justice, Retired, dissenting.

I concur in the cogent analysis of Justice Cardine regarding the confusion engendered by the instructions given which poorly differentiate, if at all, first-degree murder, Wyo.Stat. § 6–2–101 (Cum.Supp.1992), from second-degree murder, Wyo.Stat. § 6–2–104 (1988).

Additionally, I do not agree with this court's summary disposition of the failure of the prosecution and law enforcement

officials to disclose the existence of an eyewitness until the middle of the trial. In the circumstances of this case, where the conduct of the parties at the time and place of death is critical, the testimony of any eyewitness may mean a life-time difference to the surviving participant. In my opinion, the deliberate non-disclosure of the investigatory interviews, which would have revealed the existence of the eyewitness, constitutes a clear due process violation. *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

The failure of the prosecution to identify another witness in a timely fashion served justice no better. Under a totality of the circumstance review, *Zinermon v. Burch,* 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990); *Holbrook v. Flynn,* 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986), the prosecution's failure to disclose the existence of the witness denied the accused due process rights. *Brady,* 373 U.S. at 86, 83 S.Ct. at 1196. The relevant issue was avoidance of an unfair trial. *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935).

I particularly object to the use of *Gale v. State,* 792 P.2d 570 (Wyo.1990) for its re-analysis of fundamental United States Supreme Court principles to justify the decision here. *See Gale,* 792 P.2d at 590, Urbigkit, J., dissenting. *Gale* was a case where, with reasonable certainty, an innocent man was convicted by a combination of perjury, informal immunity, local community politics, and scapegoating. The decision of this court, in that appeal, provides no benefit to the direction of justice within the Wyoming legal system. The innocent was convicted and the guilty left free of responsibility, in at least two cases, after a decade-long course of criminal conduct. The use of *Gale,* with its mutative injustice, demonstrates that what happened here is likewise unjustified if *Gale* is used for a citation of authority.

Failure to fairly and realistically enforce the *Brady* concepts, which occurred in *Gale* and is now reoccurring here, can only exacerbate a condition of excused criminality, including perjury, which constitutes a dry rot, if not a facial erosion, of the entire justice delivery system.

Law enforcement officers should never *lose a complete list of witnesses* gathered at the scene of a crime. The due process violation created by the disappearance of such a document of identification is highlighted when that loss is first revealed to the defense during trial.

Furthermore, I remain concerned about the expanded use of hearsay as a believable evidentiary resource when such testimony can never be subjected to direct cross-examination. The unjustified use of hearsay and greater reliance on extraneous evidence, including bad acts and reputation, take the justice delivery system further from the truth into subjective, non-factual, jury evaluation and decision making processes. *Schmunk v. State,* 714 P.2d 724 (Wyo.1986); *Holm v. State,* 404 P.2d 740 (Wyo.1965).

Consequently, I dissent in the decision to affirm this conviction.